# STATE OF CONNECTICUT *v.* RICHARD A. LAPOINTE
## (14635)

Peters, C. J., and Callahan, Borden, Berdon, Norcott, Katz and Palmer, Js.

Argued February 16—officially released July 16, 1996

*John R. Williams*, with whom was *Norman A. Pattis*, for the appellant (defendant).

*Mary H. Lesser*, assistant state's attorney, with whom were *Rosita M. Creamer*, assistant state's attorney, and, on the brief, *James E. Thomas*, state's attorney, and *Dennis O'Connor*, senior assistant state's attorney, for the appellee (state).

CALLAHAN, J. The defendant, Richard A. Lapointe, was convicted by a jury of capital felony in violation of General Statutes § 53a-54b (7), arson murder in violation of General Statutes § 53a-54d, felony murder in violation of General Statutes § 53a-54c, murder in violation of General Statutes § 53a-54a, arson in the first degree in violation of General Statutes § 53a-111, assault in the first degree in violation of General Statutes § 53a-59 (a) (1), sexual assault in the first degree in violation of General Statutes § 53a-70 (a), sexual assault in the third degree in violation of General Statutes § 53a-72a (1) (A) and kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A).[1] At the penalty phase hearing subsequent to the defendant's conviction of capital felony, the jury found that the state had proven an aggravant beyond a reasonable doubt but also found that the defendant had proven a mitigant by a preponderance of the evidence. The defendant thereafter was sentenced to life in prison without the

[1] The defendant's convictions of arson murder, felony murder, murder, sexual assault in the first degree and sexual assault in the third degree were combined with his conviction on the capital felony count for purposes of sentencing in order to comport with constitutional double jeopardy protections. *State* v. *Chicano*, 216 Conn. 699, 725, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991).

possibility of release in accordance with General Statutes (Rev. to 1991) § 53a-46a (f).[2]

The defendant claims that the trial court improperly: (1) failed to suppress various oral and written statements he had made to officers of the Manchester police department, both because the statements were obtained without a knowing and voluntary waiver of certain of his constitutional rights and also because the statements were involuntary; (2) concluded that article first, § 8, of the Connecticut constitution does not require the police to record electronically all confessions of detained suspects when such recording is feasible; and (3) found that a state's witness was unavailable to testify at trial and, therefore, improperly admitted an audio recording of the witness' prior testimony. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On March 8, 1987, the defendant called the emergency telephone number, 911, to report a fire at the Manchester apartment of the victim, Bernice Martin, his wife's eighty-eight year old grandmother. Manchester firefighters entered the smoke-filled apartment and found the victim lying on the floor approximately six to eight feet from a burning couch. The victim was only partially clad and a piece of fabric was tied tightly around her neck. Other fabric was tied loosely about her wrists. The firefighters noted a bloodstain on the bed in the apartment. Paramedics who arrived at the scene attempted unsuccessfully to resuscitate the victim and subsequently transported her to a hospital

---

[2] General Statutes (Rev. to 1991) § 53a-46a (f) provides: "If the jury or, if there is no jury, the court finds that one or more of the [aggravants] set forth in subsection (h) exist and that no mitigating factor exists, the court shall sentence the defendant to death. If the jury or, if there is no jury, the court finds that none of the [aggravants] set forth in subsection (h) exists or that one or more mitigating factors exist, the court shall impose a sentence of life imprisonment without the possibility of release."

where she was pronounced dead shortly after her arrival. Medical personnel did not examine the victim for sexual trauma on the night of her death and did not provide the family with any information pertaining to the cause of death. A priest in attendance, however, did tell family members gathered at the hospital that the victim had been stabbed.

A knife blade and a melted brown plastic knife handle were found in the victim's apartment. The victim's underwear was found on the floor of the apartment to the right of the bed. No latent fingerprints were discovered at the scene due to fire and water damage. It was determined that the fire in the victim's apartment had three points of origin—the couch, near which the victim had been found, and two towels that were hanging in the kitchen. There was no evidence that an accelerant had been used to hasten the fire's progress. The couch, which had extensive fire damage, was tested and found to burn at a very slow rate and to emit copious amounts of smoke.

At approximately midnight on the night that the victim's body was found, Detective Edward Wilson of the Manchester police department interviewed the defendant. The defendant told Wilson that on March 8, from approximately 2 to 4 p.m., he had visited the victim at her apartment with his wife, Karen, and his son, Sean.[3] The defendant also told Wilson that after the family had returned home from their visit he had not left the house until his wife's aunt, Natalie Howard,[4] had telephoned between 7:30 and 7:45 p.m., asking him to check on the victim because she was not answering her telephone.[5] The defendant further told Wilson that, while

[3] His wife later confirmed this statement in a conversation with a Manchester police officer.

[4] Howard is also the victim's daughter.

[5] Howard had telephoned the defendant's home to speak to the defendant's wife and express her concern that the victim had not answered Howard's two telephone calls made to the victim's apartment at approximately 7:55

he was walking to the victim's apartment in order to check on her,[6] he had smelled smoke. He also said that after arriving at the apartment and receiving no answer to his knock, he had attempted to enter both the front and the back doors but that both doors were locked.[7] The defendant stated that the back door felt warm to the touch.

The defendant said that he then had gone to the apartment of Jeannette King, a neighbor of the victim, to telephone his wife and Howard. Despite having smelled smoke and having felt the heat of the door to the victim's apartment, the defendant made no effort to secure emergency assistance at that time. Rather, he walked to King's apartment and knocked on the door furthest from the victim's apartment.[8] When King opened the door, the defendant greeted her calmly and without any sign of urgency. The defendant asked King for change for a quarter so that he could use a pay telephone down the road. King, who had met the defendant previously, invited him to use her telephone. He did so, telephoning both his wife and Howard and telling them that the victim had not answered her door and that she must have been sleeping. He never mentioned to either his wife or Howard that he had smelled smoke or that the door to the victim's apartment had been warm to the touch. Howard reminded the defendant that the victim never went to bed as early as 8 p.m. and told him that

p.m. and 8:05 p.m. During this conversation, the defendant picked up another telephone in his home without being asked to join the conversation and volunteered to check on the victim himself.

[6] The defendant walked to the victim's apartment, located only a few blocks from his home, because he did not have a driver's license. The defendant took the more circuitous of the two routes available to him despite being familiar with the shorter route.

[7] A firefighter testified, however, that when he and other firefighters arrived at the scene, the back door was unlocked.

[8] There are two doors to King's apartment, one of which fronts the victim's apartment and another located on the opposite side of her building. The defendant knocked on the door furthest from the victim's apartment.

she was going to the victim's apartment immediately to check on her. The defendant then left King's apartment and returned to the victim's apartment. The defendant claimed that upon returning to the victim's apartment, he saw smoke emanating from under the eaves. He then returned to King's apartment, again knocked on the more distant of the two doors, and, when admitted, called the 911 emergency telephone number.

On March 9, 1987, an autopsy of the victim's body by the medical examiner revealed that the victim had suffered a three inch deep stab wound to her abdomen and ten less severe stab wounds to her back. The medical examiner also determined that the victim had been strangled and that she had sustained premortem first and second degree burns. The cause of death was determined to be a combination of strangulation and smoke inhalation.[9] The autopsy also revealed, for the first time, that the victim had suffered extensive hemorrhaging as well as lacerations and contusions to her vagina.

The jury further could have found that a stain on the victim's bedspread was human semen from a person who was a secretor with Type A blood. The defendant has Type A blood and is a secretor. The semen stain also was found to contain no sperm, which is consistent with the semen of a person who has had a vasectomy. The defendant had a vasectomy after the birth of his son in 1979. On March 9, before any information regarding a possible sexual assault became known to the police or the public, the defendant stated in a conversation with Eileen Giacalone, a friend of the Lapointe family, that "it was a shame they killed an old lady, but they didn't have to rape her, too." When asked in a June, 1989 interview by Detective Paul Lombardo how he had

[9] The associate medical examiner, Arkady Katsnelson, testified at trial that the victim had been alive during the fire.

learned that the victim had been sexually assaulted, the defendant responded that he had been informed by a doctor at the hospital on the night of the murder that the victim had been strangled, stabbed and sexually assaulted. The medical personnel who had attended to the victim unanimously testified, however, that they did not check the victim for sexual assault trauma when she was at the hospital that night and, further, that it would have been highly unusual for them to have done so under the circumstances. Other family members who had been present at the hospital corroborated the testimony of the medical personnel who said that there had been no mention of sexual assault at the hospital.

On March 9, officer Wayne Rautenberg interviewed the defendant at the Manchester police station. During the interview, the defendant exhibited considerable curiosity concerning the results of the autopsy and asked if there had been causes of death other than smoke inhalation.[10] The defendant's curiosity was further manifested by his persistent questions to Wilson and Captain Joseph Brooks of the Manchester police department concerning the status of the investigation and whether he was a suspect. These inquiries were made during numerous chance encounters that the defendant had with the officers in Manchester between the dates of the victim's death and the defendant's arrest.

The police investigation of the victim's death remained open and unresolved until March, 1989, when, due to internal changes at the Manchester police department, Lombardo was assigned to the case. Because the investigation had been dormant for some time, Lombardo decided to reinterview all those persons who had been interviewed previously. For that purpose, Lom-

---

[10] The defendant was not given any information about the autopsy by Rautenberg.

bardo telephoned the defendant in June, 1989, and asked if he would submit to another interview. The defendant initially responded, "Why, am I a suspect?" The defendant, however, acquiesced to Lombardo's request and, on June 8, walked to the police station where he spoke with Lombardo. At that time, in order to check the defendant's blood type, Lombardo asked the defendant for a saliva sample, which the defendant provided. The defendant's wife, in response to a direct question and in the defendant's presence, had previously told Sergeant Michael Ludlow that the defendant's blood was Type O. An analysis of the saliva sample, however, revealed that the defendant's blood type was in fact Type A and that he was a secretor. These results were consistent with the seminal stain found on the victim's bedspread. During the course of his investigation, Lombardo also belatedly learned from King that she had seen the defendant walking his dog near the victim's apartment shortly after 7 p.m. on the night of the victim's death.[11]

Inconsistencies in the defendant's version of his activities on the evening of March 8, 1987, and the defendant's prescience that the victim had been sexually assaulted led Lombardo to become increasingly suspicious. Therefore, Lombardo again requested that the defendant come to the police station on July 4, 1989.

[11] King, who was elderly, previously had failed to disclose to Kendall Keyes, a police officer who had interviewed her at the time of the crime, that she had seen the defendant walking his dog. In addition, King's testimony at both the suppression hearing and the trial manifested certain inconsistencies between her previous statements and other facts adduced at trial. At the suppression hearing, King testified that she had seen the defendant twice on the night of the murder—once at 7 p.m. when he used her telephone to call his wife and Howard, and once a few minutes later when he called 911. King was certain that the time of the defendant's visits was shortly after 7 p.m., even though 911 records logged the time of the defendant's telephone call at 8:27 p.m. King also denied having talked to anyone from the Manchester police department other than Lombardo, even though she had apparently talked to Keyes on the night of the victim's death.

At that time the defendant was interrogated and gave several incriminating oral and written statements to Lombardo, Detective Michael Morrissey and Brooks, respectively. Morrissey also interviewed the defendant's wife on the same day, at which time she conceded that the defendant had left their house on the night of the victim's death in order to walk their dog. This was contrary to what both she and the defendant had told the police previously, i.e., that the defendant had not left the house after the family returned from their afternoon visit with the victim until the defendant left after talking to Howard. On the basis of, among other evidence, the defendant's admissions made on July 4, 1989, an arrest warrant was issued, pursuant to which the defendant was taken into custody on July 5, 1989. Additional facts will be provided as necessary.

I

The defendant moved in the trial court to suppress several incriminating oral and written statements that he had given to Manchester police officers on July 4 and 5, 1989, claiming that his federal constitutional rights had been violated.[12] In his motion to suppress, the defendant raised two distinct grounds for suppression: (1) the statements had not been preceded by a knowing and intelligent waiver of his *Miranda*[13] rights; and (2) the statements were involuntary and therefore inadmissible under the due process clause of the four-

---

[12] The defendant conceded at oral argument that he did not adequately raise, before either this court or the trial court, a claim that the state constitution provides criminal defendants with additional protections in determining the voluntariness of a confession. Our review of the voluntariness of the defendant's confessions properly is limited, therefore, to a federal constitutional analysis. We note, however, that we have recently held that the state bears the burden of proving the voluntariness of a confession by a preponderance of the evidence under article first, § 8, of the state constitution, as it does under the federal constitution. *State v. James*, 237 Conn. 390, 412–26, 678 A.2d 1338 (1996).

[13] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

teenth amendment. The trial court conducted a suppression hearing over the course of twenty-four court days, during which it heard testimony from thirty-one witnesses.

Thereafter, the trial court, in a lengthy memorandum of decision, rejected the defendant's claims that there had not been a valid waiver of his *Miranda* rights and that his statements had not been voluntary. The trial court resolved the *Miranda* issue by concluding that *Miranda* warnings were unnecessary because "the defendant was not in custody when he gave his confessions to members of the Manchester police department." See *Oregon* v. *Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977) (defendant must be in custody before *Miranda* applies); *State* v. *Northrop*, 213 Conn. 405, 413–16, 568 A.2d 439 (1990) (same). The trial court also determined that, although the defendant was not in custody and, consequently, the police had not been obligated to advise him of his *Miranda* rights, the state nevertheless had proven by a preponderance of the evidence that the defendant had been advised of his rights and had made a knowing and voluntary waiver of those rights before giving any statements to the police. In deciding the defendant's voluntariness claim, the trial court concluded that "all confessions made by the defendant to members of the Manchester police department on July 4, 1989, were voluntarily made and were not the product of police coercion." We agree with the trial court that the defendant was not in custody at the time he made the statements at issue and that the statements he made were voluntary.

At the suppression hearing and at trial, the state presented the following evidence[14] concerning the circum-

[14] In ruling on the defendant's motion to suppress, the trial court credited the state's version of the events and emphasized that it had not been "faced with a situation in this case where the level of credible evidence offered by the state and [the] defense is comparable." We are bound to accept the

stances under which the defendant's incriminating statements were made.[15] Shortly after 3 p.m. on July 4, 1989, Lombardo telephoned the defendant and asked if he would come to the police station that afternoon to discuss the victim's death. The defendant stated that he was willing to go to the police station but that it would take him some time to get there because he did not have a car. Lombardo then offered to send a police car to pick up the defendant. The defendant agreed, but requested that the car be unmarked. At approximately 3:30 p.m., a plainclothes police detective, Lorraine Duke, picked up the defendant at his home in an unmarked Honda Accord. During the trip to the police station, the doors to the car were unlocked and the defendant was unrestrained and sat in the front seat beside Duke. When they arrived at the police station, Duke dropped off the defendant in the back parking lot and the defendant walked unaccompanied into the station. Upon entering the station at approximately 3:45 p.m., the defendant was greeted by Lombardo, who directed the defendant to the sergeant's desk.

Ludlow, who was the desk sergeant that day, read the defendant his *Miranda* rights, stopping after each right and asking the defendant to confirm orally that he understood what had just been read to him. After receiving the defendant's oral assurance that he understood his rights, Ludlow asked the defendant to read over each of the rights himself and to place his initials beside each enumerated right on a preprinted form in order to acknowledge once more that he understood them. The defendant did so. The defendant then indi-

---

trial court's findings of fact unless they are clearly erroneous. Our review of the record leads us to conclude that none of the trial court's findings was clearly erroneous.

[15] We may consider the testimony adduced both at the trial and at the suppression hearing when determining the propriety of the trial court's ruling on a motion to suppress a confession. *State* v. *Toste*, 198 Conn. 573, 576, 504 A.2d 1036 (1986).

cated orally to Ludlow that he would speak with the police officers and that he did not wish to have an attorney present. The defendant also signed that portion of the preprinted form indicating that he waived his *Miranda* rights and would speak with the police. The defendant did not sign or otherwise mark that portion of the preprinted form that would indicate that he wished to assert his rights.

Lombardo then walked with the defendant through the office of the detective division of the police department and proceeded upstairs with him to the youth services office where Lombardo intended to conduct the interview with the defendant.[16] Upon arriving in the

[16] The evidence revealed that Lombardo had placed a number of props in the detective division office and in the youth services office designed to lead the defendant to believe that the investigation into the victim's death was of the utmost importance to the Manchester police department and that the police had more evidence pointing to the defendant as the victim's killer than they actually had. In the detective division office, these props included a sign on the door to the office that read, "Bernice Martin Homicide Task Force," two photographs of the victim, photographs of the victim's apartment complex, a fabricated deoxyribonucleic acid (DNA) chart indicating that the defendant's DNA matched that of the killer, a chart that accurately indicated that the killer's blood type and secretor status matched that of the defendant, two maps covering both the defendant's address and the victim's address and indicating, partially truthfully, that dog tracking from the victim's apartment had led to the defendant's apartment, a fingerprint comparison unrelated to the victim's death, writing on a blackboard listing the defendant's places of employment and the names of certain streets in the area of the victim's apartment, fabricated lists of police teams assigned to the fictional Bernice Martin Homicide Task Force and two manilla folders labeled "Bernice Martin Homicide Investigation" that another officer handed to Lombardo as he walked through the detective division office. In the youth services office, the props included another "Homicide Task Force" sign, two plaques on the wall that Lombardo had been awarded for outstanding police work, and a label on a filing cabinet drawer with the defendant's name on it.

In denying the defendant's motion to suppress, the trial court found as a factual matter that there was "no evidence that the defendant saw any of these artifices except two photographs of the decedent which were posted on the bulletin board and, according to Lombardo, were commented on by the defendant as they passed through the detective division's office. The defendant's own testimony is that he does not remember seeing any of the

youth services office, Lombardo immediately informed the defendant that he was not under arrest, that he was free to leave and that he was under no obligation to speak with Lombardo. The defendant responded by stating that he was willing to speak to Lombardo. Lombardo then informed the defendant that he believed the defendant to be responsible for the victim's death. The defendant initially denied these accusations simply by responding, "No." Within one hour, however, the defendant became quiet, slumped down in his chair, sighed and stated, "I killed her." When Lombardo tried to elicit further details, the defendant denied both that he had killed the victim and that he had just made the statement admitting to having done so. The defendant then asked Lombardo if it would be possible for someone to commit a crime and then not remember doing it afterward. Lombardo responded by telling the defendant that he thought that might be possible. The defendant then stated that it was possible that he had killed the victim, but that he could not remember doing so. After making a further admission, the defendant agreed to dictate an initial statement to Lombardo. That statement provided: "On March 8, 1987, I was responsible for Bernice Martin's death, and it was an accident. My mind went blank." After Lombardo had transcribed the statement, the defendant read it and signed it under oath.

[props]." On the basis of our review of the record, which includes the testimony of both Lombardo and the defendant that the defendant was unaware of the devices around him during his brief trip (less than ten seconds) through the detective division office or during his interview in the youth services office, we conclude that the trial court's determination that the defendant was unaware of the props is not clearly erroneous. With the exception of the two photographs of the victim, therefore, we do not include the props in either the detective division office or the youth services office in our calculus of the totality of the circumstances surrounding the defendant's confession, because objects of which the defendant was unaware could not have affected the voluntariness of his statements to the police.

Immediately after the statement was signed, the defendant asked to use the bathroom. Lombardo consented and escorted the defendant to a bathroom down the hall. Lombardo waited for the defendant in the hallway and returned to the youth services office with him after the defendant had exited the bathroom. The defendant was not handcuffed or otherwise physically restrained or observed during this trip to the bathroom.

Upon the defendant's return from the bathroom, Lombardo continued to question him in the hope of obtaining specifics about the circumstances of the victim's death. The defendant instead retracted his earlier statement and said that he had only given it so that he could use the bathroom. Lombardo admonished the defendant, telling him that he knew that he was free to use the bathroom at any time. Thereafter, the defendant put his head down and became quiet.[17] The defendant also at times became agitated during questioning, at one point throwing his glasses across the desk at which he and Lombardo were sitting. Shortly after that outburst, the defendant abruptly stated, "She wouldn't cooperate with me, so I killed her." When Lombardo asked the defendant how the victim had failed to cooperate, the defendant replied that the victim had refused to engage in sexual intercourse with him.

When the defendant was confronted with the fact that an eyewitness had reported seeing him near the victim's apartment at approximately 7 p.m. on March 8, 1987, the defendant recanted his earlier statement that he had been at home the entire evening until his wife's aunt had telephoned at approximately 8 p.m.

---

[17] Lombardo testified that at some point after the defendant had returned from the bathroom, Lombardo had told him that his fingerprints had been found on the handle of the knife that had been used to stab the victim even though the knife handle had melted in the fire and no fingerprints had actually been recovered from it.

asking him to check on the victim. The defendant then admitted that he had left his apartment prior to that time, contrary to what he had previously told the police.[18] He also stated that, when he had gone to the victim's apartment, he had "felt the time was right" and had made a pass at the victim. The defendant stated that the victim had "probably" said "no," so he had punched and strangled her. At that point, Lombardo asked the defendant if he would be willing to give a second written statement and the defendant agreed to do so. As with the first statement, the defendant dictated the second statement to Lombardo, who transcribed it. Lombardo then asked the defendant to read over the statement. The defendant did so, correcting a spelling error that had been made by Lombardo. The defendant initialed the correction and also placed his initials at the end of the statement. Immediately thereafter, the defendant asked Lombardo if he could add something to the statement. When Lombardo agreed, the defendant dictated the following addendum to his statement: "I made a pass at Bernice because she was a nice person and I thought that I could get somewhere with her. She was like a grandmother to me, that I never had."[19] The defendant initialed these lines. Lombardo then placed the defendant under oath and asked him to sign the statement as an acknowledgment that the information contained therein was true and correct. The defendant

---

[18] The defendant also had told Giacalone the day after the victim's death that he had visited the victim the previous day, before he had discovered the fire. Moreover, in addition to her testimony that the defendant had walked their dog sometime after returning home from their afternoon visit with the victim, the defendant's wife testified at the suppression hearing that the defendant could have left their condominium again between approximately 6:15 and 7 p.m. on the night of the victim's death, when she had been upstairs in their home preparing their son for bed.

[19] Before interviewing the defendant, the police had no information about the defendant's extended family. The defendant admitted at trial that he had never known either of his grandmothers.

signed the statement. This second statement was taken two to two and one-half hours after the first statement.[20]

After the defendant had signed the second statement, Lombardo sought to elicit further details from the defendant concerning the victim's death. In response, the defendant turned away from Lombardo, put his head in his hands and stated, "If I tell you everything, then the whole town's going to find out and know that I am a sex fiend." Lombardo then told the defendant that it might be possible to have the case sealed so that the press would not have easy access to it. The defendant was unpersuaded and informed Lombardo that once the case went to trial, it would become public knowledge and everyone would find out about it. As the questioning proceeded, the defendant eventually became teary and explained to Lombardo that if his wife found out what he had done to her grandmother, she would leave him. He further explained that his wife and son were his only real family and that if they left him, he would consider suicide.

After the defendant had composed himself, he asked Lombardo if he could use a telephone to call his wife or an attorney. Lombardo moved the telephone on the desk toward the defendant and told him that he was free to use it. When the defendant did not pick up the

---

[20] The second statement read: "I, Richard A. Lapointe, do hereby give the following statement to Detective Paul Lombardo of my own free will, free of any threats or promises that:

"On March 8, 1987, I went to visit Bernice Martin with my wife and son. We left the apartment in the late afternoon and went home. I left my house sometime after that to take the dog for a walk.

"I was at Bernice's apartment with the dog. We were both there together and the time was right. I probably made a pass at her and she said no. So I hit her and strangled her.

"If the evidence shows that I was there, and that I killed her, then I killed her, but I don't remember being there.

"I made a pass at Bernice because she was a nice person and I thought that I could get somewhere with her. She was like a grandmother to me, that I never had."

telephone, Lombardo asked him if he wanted to call an attorney and the defendant did not respond.[21] Shortly thereafter, at approximately 8 p.m., the defendant asked if he could use the bathroom again and Lombardo stated that he could. The defendant then went down the hall to the bathroom unaccompanied. On the way to the bathroom, he passed two exits from the police station.

While the defendant was in the bathroom, Morrissey, who had interviewed the defendant's wife earlier that day, approached Lombardo at the entrance to the youth services office, where they had a brief conversation about Morrissey's interview with the defendant's wife. When the defendant returned from the bathroom, Lombardo asked him if he would be willing to talk to Morrissey. Lombardo reiterated to the defendant that he was free to leave and that he did not have to talk to Morrissey if he did not wish to do so. The defendant agreed to stay and speak with Morrissey.

After Lombardo left the youth services office to return to his desk in the detective division office at approximately 8 p.m., Morrissey interviewed the defendant in the youth services office. Morrissey began by telling the defendant what had transpired during his interview of the defendant's wife, including the fact that she had expressed her support for the defendant and that she hoped that the defendant would tell the truth. The defendant told Morrissey that his wife knew what he had done and he expressed concern about the embarrassment that the incident would cause his family. Morrissey also told the defendant that his wife had said that, contrary to the defendant's earlier statements to the police, the defendant had left their home after the family returned from their afternoon visit to the victim's apartment and before Howard had telephoned. The

---

[21] The defendant never again mentioned either contacting an attorney or using the telephone.

defendant then admitted that, prior to the telephone call from Howard, he had walked the dog to the victim's apartment and that the victim had invited him in for coffee. The defendant then recanted this admission and stated that he had not gone to the victim's apartment and that he had "blackened the whole thing out." On three other occasions during his interview with Morrissey, the defendant repeated similar statements about "blacking" out the whole thing. On each occasion when the defendant referred to a blackout, Morrissey encouraged the defendant to start over from the beginning. During his interview with Morrissey, the defendant requested that they take two breaks—one to use the bathroom and one to get a snack. The defendant was permitted to go to the bathroom unaccompanied. He was also brought to a group of vending machines in the building, where he selected a package of cookies and a can of juice, both of which were purchased for him by Morrissey.

After the trips to the bathroom and the vending machines, the defendant gave Morrissey a more detailed statement than he had given Lombardo concerning the events at the victim's apartment on the evening of March 8, 1987. The defendant stated that he and the victim had had coffee and tea, respectively, on the couch in the living room. After having sat on the couch for a short time, he had used the bathroom that was located off of the victim's bedroom. When he came out of the bathroom, the victim was standing in front of her dresser in the bedroom brushing her hair and, at that point, he "thought the time was right." He stated that the victim was dressed in a pink housecoat and was wearing no bra and that he had seen her breasts when she had bent over. He stated that he then had grabbed the victim and that she had pushed him away. In response, he had thrown her on the bed and had pulled off her underwear. The defendant said that he then

had inserted his penis into the victim "for a couple of strokes" and then had "pulled out" and masturbated until he had ejaculated on the bedspread.

Morrissey then asked the defendant if the victim had screamed. The defendant said that she had not. In order to test the defendant, Morrissey told him that a neighbor had reported having heard screams, although that in fact was not the case. The defendant adhered to his story, however, and adamantly denied that the victim had screamed.

The defendant also told Morrissey that originally he had intended to leave the apartment after he had ejaculated. He had changed his mind, however, when the victim informed him that she intended to tell his wife what had occurred. The defendant stated that he then went to the kitchen, where he obtained a steak knife with a brown plastic handle. When he returned to the victim, he stabbed and strangled her on the couch. The defendant also told Morrissey that immediately thereafter he had started fires at two separate places on the couch and then had left and gone home.

In response to a request, the defendant agreed to give Morrissey a written statement memorializing what he had just told him. As with the two written statements that he previously had given to Lombardo, the defendant dictated the statement and Morrissey transcribed it. Morrissey repeated each statement back to the defendant as he wrote it down. On two occasions, Morrissey, in order to assess the defendant's comprehension of the statement, wrote down and read back a sentence to the defendant stating something different from that which the defendant had just related. On both occasions, the defendant immediately corrected Morrissey, Morrissey made the correction, and the defendant initialed the change. After he had finished transcribing the statement, Morrissey read the entire

statement out loud to the defendant, including an additional misstatement that the defendant corrected and initialed.[22] Morrissey then asked the defendant to read the statement to himself. Thereafter, the defendant attested to the veracity of the statement under oath and signed it.[23] This third statement was taken at approximately 11:30 p.m. Morrissey then asked the defendant to wait in the youth services office while Morrissey told his supervisors that he had concluded the interview.

Morrissey told Brooks, his supervisor, that he had concluded his interview with the defendant. Brooks then went to the youth services office where he greeted the defendant, whom he had known personally for some

---

[22] The errors Morrissey inserted into the defendant's statement, which the defendant corrected, were the following: Morrissey substituted "housecoat," although the defendant had said "underwear" when referring to that which he had taken off of the victim; and he wrote "slapped," although the defendant had said "threw," when describing the means he had used to force the victim to the bed. Morrissey also had written "lighter," although the defendant had said "smoking pipe."

[23] The statement provided as follows: "I swear to Det[ective] Michael Morrissey that the statement I am about to give is the truth to the best of my knowledge; that on Sunday, March something, I was at Bernice Martin's apartment with my son, Sean, and my wife, Karen. We visited from about 2 to 4 p.m., and then walked back home. After being home awhile, I left to walk the dog. I then walked back up to Bernice's apartment, and she invited me in. We each had a cup of coffee (I think Bernice had tea). And I sat on the couch. I recall having my matches and my smoking pipe in my jacket pocket.

"After my coffee, I went into the bathroom (which is located off the bedroom). When I came out, Bernice was in the bedroom combing her hair. She was wearing a pink housecoat type of outerwear with no bra. (I could see her breasts when she bent over). I grabbed her with my hand around her waist area. When I did that she pushed me. I threw her on the bed and took off her underwear because I wanted to have intercourse with her. I got my penis inside her for a few strokes and then pulled out and masturbated. I did [come] on the bedspread when I was finished. I had already thrown her underwear on the right side of the bed. After the sex she said she was going to tell my wife Karen. I then went to the kitchen and got a steak knife with a hard plastic brown handle and stabbed Bernice in the stomach while she was laying on the couch. The rest of the incident I do not recall although I admit to having strangled her."

time, and inquired as to the defendant's well-being, i.e., whether the defendant was cold, tired or hungry. When the defendant said that he was cold, Brooks provided him with a jacket. The defendant also told Brooks that he had had some snack food and was not hungry at that time. Brooks asked the defendant if he had been advised of his *Miranda* rights and the defendant stated that he had. Brooks also asked the defendant if he was aware of the fact that he was free to leave and the defendant said that he was not aware of that. Brooks then emphasized to the defendant that he was not under arrest, that he was free to leave at any time and that he could contact an attorney if he so desired. The defendant stated that he understood. Brooks further asked the defendant if he was willing to speak with him and the defendant said that he was.[24]

In response to Brooks' inquiries concerning the reasons for the recantations of his earlier admissions, the defendant stated that he had repeatedly recanted because he did not want his wife and child to know what he had done. When Brooks tried to elicit either a firm admission or a firm denial from the defendant, the defendant told Brooks that he could neither confirm nor deny that he had killed the victim. In response to a further inquiry from Brooks, the defendant also admitted that he had had a vasectomy after the birth of his son. Brooks asked this question because he was aware that the seminal stain on the victim's bedspread contained no sperm, a characteristic of a person who has had a vasectomy. At that point, Brooks was notified that the defendant's brother-in-law, Kenneth Martin, and his stepfather-in-law, Ted Dana, were in the lobby waiting to see the defendant. Brooks concluded the interview and brought the defendant to the lobby, where

---

[24] At one point during his interview with Brooks, the defendant lost his temper. Brooks then reminded the defendant that he was free to leave, but the defendant elected to stay.

the defendant talked to Martin and Dana, and shortly thereafter left the police station with them.

On the ride home, the defendant told Martin and Dana that the police thought that he had killed the victim but that he had denied it. When the defendant arrived home, his mother-in-law, Margaret Dana, asked him if he was hungry or thirsty, and he replied that he was not because he had had something to eat at the police station. His mother-in law also asked him if he had known that he had been free to leave the police station if he so desired. The defendant told his mother-in-law that he had known he could leave but that he did not because he was "just there talking."

At the suppression hearing and at trial, the defendant testified to a somewhat different version of the events surrounding his various admissions and statements to the police. The defendant agreed that he had been picked up at his house in an unmarked police car as he had requested. He also agreed that he had been read his *Miranda* rights by Ludlow when he first arrived at the police station, that he had "glanced"[25] at the waiver of rights form from which Ludlow had read to him, and that he had signed the bottom of the form.

The defendant further testified that he had not seen any of the various props described in footnote 16, in either the detective division office or the youth services office. The defendant also stated that he initially had denied killing the victim and that at some point he had requested an attorney,[26] but that Lombardo had told him that the police department would get him a lawyer

---

[25] The defendant explained that he had only "glanced" at the form because Ludlow had already read the form to him and he believed that Ludlow's reading of the form was accurate.

[26] Kenneth Selig, a psychiatrist retained by the defendant to evaluate his mental state, testified that the defendant had told him that he had neither asked for a lawyer nor thought about getting one while at the police station on July 4 and 5.

"later."[27] Contrary to Lombardo's testimony, the defendant did not recall having asked Lombardo to use the telephone to call his wife or an attorney. The defendant testified that after having made "four or five" denials, he finally asked Lombardo, "What do you want me to do, tell you I did it?" and that Lombardo had responded in the affirmative. The defendant also claimed that he

---

[27] In his initial brief in the section addressing the issue of whether article first, § 8, of the Connecticut constitution requires the electronic recording of confessions, the defendant alludes to his alleged request for counsel and to the state's evidence that he had requested to use the telephone to call either his wife or an attorney. The defendant includes in that section a summary of the facts and a discussion of the case law relevant to the issue of the invocation of the right to counsel, but never specifically argues anywhere in his brief that, under either version of the facts pertaining to his reference to an attorney, either he was denied the right to counsel or there was an ineffective waiver of his right to counsel. From the structure of the defendant's brief and the arguments contained therein, it appears that he alludes to this issue only to point out the virtues of electronic recording and the added protections such recording would provide to criminal defendants in the exercise of their rights. In response to the state's allegation that he had waived such a claim in his initial brief, the defendant, in his reply brief, attempts to backtrack and raise the claim that he was denied his right to counsel. The defendant asserts therein: "[O]ne of the central issues in this appeal is whether due process requires electronic recording of custodial statements. Had there been such a recording, the defendant's claim that he was denied a right to counsel when he clearly and unequivocally asked for one would have been easier to review." Pointing out that a potential claim on appeal would have been easier to decide had something else happened generally does not constitute raising that claim. We have, however, given the defendant the benefit of the doubt and assume that he did not waive the issue of the denial of his right to counsel.

Such beneficence, however, does not save the defendant's claim on the merits. The trial court's finding, which was not clearly erroneous, was that the defendant merely asked on one occasion whether it would be possible to use a telephone to call either his wife or an attorney and that a telephone had been provided for that purpose but that he had elected not to use it. We agree with the trial court that the defendant's request to use the telephone did not sufficiently invoke the right to counsel and the police, therefore, were not bound to stop questioning the defendant. See *Davis* v. *United States*, 512 U.S. 452, 462, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994) (statement "[m]aybe I should talk to a lawyer" held not request for counsel); *State* v. *Anderson*, 209 Conn. 622, 628–30, 553 A.2d 589 (1989) (defendant's remark that he "better call his wife and lawyer" not unequivocal request for lawyer).

had asked to use the bathroom "four or five" times and that Lombardo had told him that he could use the bathroom "later."

The defendant also recalled having signed only one statement for Lombardo, but when asked if the signatures on each of the two statements taken by Lombardo were his, he stated that they were. The defendant stated that the contents of the first statement may have come from him but that several of the details in the second statement had been provided by Lombardo and that he had merely agreed. At the suppression hearing, the defendant admitted, however, that he may have made the statement, "If the evidence shows that I was there, and that I killed her, then I killed her, but I don't remember being there." The defendant also admitted that he may have made the statement, "I made a pass at Bernice because she was a nice person, and I thought that I could get somewhere with her. She was like a grandmother to me, that I never had."[28] The defendant testified that he had signed statements only because he wanted to leave the police station. He agreed, however, that no one had forced him to sign his name. The defendant also agreed that he had never asked either Lombardo or Morrissey to take him home and that he had never indicated to either Lombardo or Morrissey that he wished to leave.

The defendant also testified that at some point during his stay at the police station, he had agreed to talk to Morrissey and to answer Morrissey's questions. The defendant admitted that he had been left alone for a period of time during the course of his interview with Morrissey, but stated that he had not left the station because he did not believe that Morrissey had com-

---

[28] At trial, the defendant changed his testimony and denied any possibility that any portion of the second written statement that he had signed had originated with him rather than Lombardo.

pleted his questioning. He also testified that Morrissey had threatened that, if his story did not coincide with that of his wife, his wife might be incarcerated and his child might become a ward of the state.[29] The defendant then testified that Morrissey had essentially accused him of committing the crimes, that Morrissey had provided the details of the crime, and that he merely had agreed because he "wanted to get out of there" and because he "wanted to go to the men's room." The defendant conceded, however, that Morrissey had provided for his comfort with food and drink from vending machines in the building.[30] He further testified that at the end of their interview, Morrissey had asked him to sign a statement but that he could not remember if he had read or signed that statement. The defendant also testified that he did not remember making any changes to the statement after Morrissey had transcribed it. The defendant also agreed that after he had spoken to Morrissey, he had spoken briefly to Brooks about his vasectomy.[31] The defendant, however, stated that he could not remember any other details concerning his conversation with Brooks and did not remember telling Brooks that he would neither confirm nor deny that he had killed the victim.

At the suppression hearing, the defendant presented, as expert witnesses, Anne Phillips, a clinical psychologist, and Kenneth Selig, a psychiatrist, to testify con-

[29] Morrissey denied making any such threat. Moreover, the defendant agreed that he had not given his statement in an effort to make it coincide with his wife's statement because, as the defendant explained at the suppression hearing, he "didn't know what [his] wife [had] said."

[30] The defendant testified that at some point during his interview with Lombardo, he had told Lombardo that he had not eaten all day. When asked if Lombardo had told him he could not have anything to eat, the defendant replied, "No. I'm not sure. I think he might have said, 'Wait until you get done.'" The defendant subsequently reiterated that he was not sure if Lombardo had said that.

[31] The defendant recalled that the conversation with Brooks had taken place in a room other than the youth services office.

cerning his mental condition and to substantiate his contention that his statements were involuntary because his will had been overborne by the police. Before interviewing the defendant, Phillips had been told that he had been interrogated over "a very lengthy period of time" and that he had been threatened with the loss of his wife and child. With that factual background, Phillips conducted a full battery of psychological tests[32] on the defendant and interviewed him on three occasions for a total of three and one-half hours. The revised edition of the Wechsler Adult Intelligence Scale (WAIS-R) revealed that the defendant had a full-scale intelligence quotient (IQ) of 92.[33] This is in the average range. Phillips testified that only an individual with an IQ of 69 or below is considered mentally retarded.

After testing the defendant, Phillips consulted Geraldine Cassens, the head of the neuropsychology program at the Institute of Living in Hartford, because some of the defendant's test responses had indicated to Phillips that he might have some form of "organic impairment."[34] Cassens reported to Phillips that in her opinion the defendant suffered from "right frontal and posterior cerebral dysfunction." Phillips also testified that the

---

[32] According to Phillips, these tests included the revised edition of the Wechsler Adult Intelligence Scale, the Wechsler Memory Scale, the Bender-Gestalt test, the Aphasia Screening test, the Rorschach Inkblot test, the Thematic Apperception test, a sentence completion test and the revised Minnesota Multiphasic Personality Inventory.

[33] The defendant's verbal IQ was 90, while his performance IQ was 98. Phillips testified that the verbal IQ "measures an individual's competence in areas that are generally mediated verbally" and "tend[s] to tap more educationally-based areas of functioning," while the performance IQ is "less educationally-based" and "tends to involve more naive [sic] problem-solving tasks." There is "a higher correlation between someone's level of attained education and the verbal IQ, than the performance IQ." The full-scale IQ represents a combination of the results of the verbal and performance subtests.

[34] Phillips provided examples of responses that she considered "very idiosyncratic," including the following: (1) when asked what Marie Curie was famous for, the defendant responded by noting that she had a wax museum, apparently confusing Marie Curie with Madame Tussaud; (2) when asked

defendant had been diagnosed with Dandy Walker Syndrome and that he had had five operations to relieve the pressure on his brain caused by that condition. Phillips testified that she was unable to provide any details about the effects of Dandy Walker Syndrome on the defendant but that she believed that it would not exhibit the same manifestations in every individual. Phillips further testified that the defendant "is not a person who's thought disordered; this is not a person who's retarded." She did say, however, that the defendant's revised Minnesota Multiphasic Personality Inventory (MMPI-II) results revealed that the defendant has "a low ability to control or check angry or disagreeable feelings."[35]

how much change one would get if one gave a clerk fifty cents for a fourteen cent purchase, the defendant responded, "You would get a quarter, a dime and a penny. . . . That must be thirty-six cents."

Examples of potential examiner bias were raised by the state on cross-examination. Phillips testified that on the vocabulary subtest that is part of the revised WAIS-R, the examiner asks the subject to define various words and then gives the subject a score from zero to two depending on the accuracy of his response. When asked to define the word "terminate," the defendant, who had previously been fired from various jobs and who had consulted an attorney about wrongful termination suits, responded, "fire, get rid of." Phillips gave the defendant a score of zero for that particular answer even though the manual accompanying the revised WAIS-R indicates clearly that such a response should be given a score of one. Phillips' error in scoring affected not only the defendant's score for that particular question but also his overall score in that the tester is instructed to stop after the fifth consecutive word for which the subject receives a score of zero. Had the defendant been given his correct score for the word "terminate," the test would have lasted for at least five more questions and the defendant would have had the opportunity to accumulate more points on the vocabulary subtest.

Examiner subjectivity was also apparent in the scoring of the comprehension subtest of the WAIS-R. When asked why some people prefer to borrow money from a bank rather than from a friend, the defendant responded, "A bank has more money." Phillips gave the defendant a zero out of two for this response even though one of the two point answers suggested by the manual was that it would be better to borrow from a bank "because more money would be available" from the bank.

[35] The defendant had also told Phillips that, before the time of the sexual assault on the victim, he had been experiencing sexual frustration because

In response to questions about her knowledge of the defendant's statements to the police and the surrounding circumstances, Phillips conceded that she had never seen any of the three written statements. She also conceded that she had never spoken with anyone who knew the defendant personally in order to find out how the defendant interacted with others on a daily basis and whether he was overly suggestible or deferential to others.

Selig testified concerning the defendant's mental makeup after having interviewed the defendant and his mother and having reviewed a number of documents associated with the case. These included a memorandum written by defense counsel purporting to outline "inconsistencies between [the defendant's] statements to the police and what could be construed as the known facts," transcripts of interviews between defense investigators and certain of the defendant's family members, and the defendant's MMPI-II results. Selig diagnosed the defendant as having a dependent personality disorder. On direct examination, Selig described the manifestations of this disorder as the defendant's "tendency to defer to other people, to accept other people making important decisions for him, to defer to other people's points of view, rather than get into arguments with them, out of concern that he'll be rejected or harmed in some way—harmed emotionally; his sensitivity to criticism, his tendency to be compliant and submissive." Selig diagnosed the defendant's disorder and his tendency to be compliant based in significant part upon the defendant's own assertions that he had had a vasectomy at his wife's request even though he felt that it was a sin to have such an operation, that his wife controlled where they lived and when they would have sexual relations, and that he was relieved that his wife made

---

of the "great disparity" in the frequency with which he and his wife had desired to have sexual relations.

all of his decisions for him.[36] This report by the defendant to Selig concerning the power dynamics between the defendant and his wife contradicted not only the defendant's own testimony at both the suppression hearing and the trial,[37] but also the testimony of numerous other witnesses, including his wife, who testified that the defendant was quite assertive and argumentative at times.

Selig also testified that it was his opinion that an experienced investigator could extract from the defendant a confession to a heinous crime that he did not commit, just as the defendant's wife, according to the information given to Selig, had forced him to have a vasectomy. Selig was able to provide a somewhat more detailed description of Dandy Walker Syndrome[38] but, like Phillips, was unable to relate its effects directly to

[36] Selig cited as another example of the defendant's inability to make his own decisions the fact that the defendant had telephoned his wife after he had smelled smoke near the victim's apartment and found the door to her apartment warm to the touch. Selig viewed this scenario as evidence that the defendant could not decide what to do in that situation without consulting his wife. The evidence reveals, however, that the defendant did not telephone either his wife or Howard seeking advice as to what action to take given the obviously dangerous nature of the situation, but, rather, that he concealed the facts of the situation from them and merely told them that the victim must have been asleep.

[37] For instance, the defendant testified that it was his decision to have a vasectomy and that he did not believe it was a sin to have such an operation. His wife fully corroborated that testimony.

[38] Selig described Dandy Walker Syndrome as follows: "There is in the brain a fluid that sort of bathes and protects the brain called the cerebrospinal fluid. And it circulates through the brain, and it circulates in different areas of the brain, sort of different sacs or pouches, I suppose you call them, called ventricles. And in the Dandy Walker Syndrome, there is an obstruction of one of the ventricles. The fluid is not able to circulate properly; it remains in the brain, and it develops a condition called hydrocephalus, which is known by a lay term as water on the brain, which requires a release of this sort of—I suppose a way to think of it is a damming effect, by a so-called shunt, which essentially provides an opportunity for the fluid to recirculate, thus relieving pressure on the brain, and relieving this buildup of water."

the defendant. He further testified that once the flow of the cerebrospinal fluid was corrected by the surgical implantation of a shunt, as had been done to the defendant, it is possible that the person with the condition would be left with no impairment. Selig, like Phillips, testified that the defendant suffered from no thought disorder.[39]

In order to counter the defendant's experts' opinions concerning the defendant's possible inability to assert himself and their testimony that the defendant might be meek and highly suggestible, the state presented several witnesses, both at the suppression hearing and during rebuttal at trial, who testified that, in view of their personal experiences with the defendant, they found him to be extremely independent, assertive, argumentative and even hot tempered. The defendant's wife testified that the defendant was more than capable of making up his own mind and that he made many of the major family decisions, including the decision to have a vasectomy. Mary McDonald, a former neighbor in the defendant's condominium complex, testified that the defendant confronted all visitors whom he did not know and inquired as to their business on the premises. Another former neighbor, Jean Strimike, testified that she knew the defendant to become "angry . . . threatening . . . [and] violent" when others had failed to do something that he had requested. For instance, the defendant, an ardent and aggressive enforcer of his condominium association's bylaws, once informed Strimike that she had violated one of the bylaws by planting flowers in front of her condominium. According to Strimike, when she failed to remove the

---

[39] Selig also requested a neurological examination of the defendant, which was performed by G.W. Anderson, a neuropsychologist. Anderson administered a computerized axial tomography (CAT) scan to the defendant, which showed that the defendant had had surgery, that a shunt was in place, and that the brain was otherwise normal. Anderson also gave the defendant an electroencephalogram, the results of which were within normal limits.

flowers as demanded by the defendant, he "stomped them into the ground." In addition to the flower incident, Strimike testified that she had often seen the defendant become angry and that he was "retributive" in that she had frequently witnessed him trying to "get even" with others for perceived wrongs. Several of his wife's family members testified that the defendant was independent and far from submissive. Finally, James M. Higgins, Jr., an attorney from Manchester called by the defense, testified that the defendant had consulted him about drafting a will in 1986. Higgins testified on cross-examination that the defendant met with him on several occasions to discuss changes that the defendant wanted made to the will, and that the defendant had no problem speaking his mind in that setting and was not intimidated by the fact that Higgins was a lawyer.

## A

The defendant's first claim of law is that the trial court improperly determined that he was not in custody during his questioning at the Manchester police station and therefore improperly held that he was not entitled to *Miranda* warnings. We disagree. "*Miranda* and the due process clause affect the admissibility of a defendant's statements differently. Due process requires only that a defendant's statements be uncoerced; the *Miranda* rules condition the admissibility of an uncounselled statement taken during police interrogation on the state's demonstrating 'that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' *Miranda* [v. *Arizona*, 384 U.S. 436, 475, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)." *Miller* v. *Dugger*, 838 F.2d 1530, 1537 (11th Cir. 1988). An officer's obligation to administer *Miranda* warnings attaches " 'only where there has been such a restriction on a person's freedom as to render him "in custody." ' " *Stansbury* v. *California*, 511 U.S. 318, 321, 114 S. Ct. 1526, 128 L. Ed. 2d

293 (1994) (per curiam), quoting *Oregon* v. *Mathiason,* supra, 429 U.S. 495 (per curiam); see *Illinois* v. *Perkins,* 496 U.S. 292, 296, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990). In determining whether the defendant was in custody, we need to examine all of the circumstances surrounding the interrogation. " '[T]he ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " *Stansbury* v. *California,* supra, 322; *State* v. *Ross,* 230 Conn. 183, 204, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995). "The defendant bears the burden of proving custodial interrogation. *State* v. *Pittman,* [209 Conn. 596, 606, 553 A.2d 155 (1989)]. The trial court's determination of the historical circumstances surrounding the defendant's interrogation are questions of fact; id.; which will not be overturned unless they are clearly erroneous. *State* v. *Young,* 191 Conn. 636, 652, 469 A.2d 1189 (1983); *State* v. *Ostroski,* 186 Conn. 287, 292, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982); see Practice Book § 4061. In order to determine the ultimate issue of custody . . . we will conduct a scrupulous examination of the record; *State* v. *Weidenhof,* 205 Conn. 262, 267–68, 533 A.2d 545 (1987); in order to ascertain whether, in light of the totality of [the] circumstances, the trial court's finding is supported by substantial evidence. *State* v. *Pittman,* supra, 606; *State* v. *Toste,* 198 Conn. 573, 580, 504 A.2d 1036 (1986); *State* v. *Alexander,* 197 Conn. 180, 185, 496 A.2d 486 (1985)." *State* v. *Atkinson,* 235 Conn. 748, 759, 670 A.2d 276 (1996).[40]

The trial court determined that the defendant was not in police custody on July 4 and 5 when he was

---

[40] In *Atkinson,* we determined that this standard is equivalent to that employed by the United States Supreme Court, which identifies the custody determination as a mixed question of law and fact, although we have never used that particular label. *State* v. *Atkinson,* supra, 235 Conn. 759 n.17.

interviewed at the Manchester police station and, there-
fore, *Miranda* warnings were not required in order for
his statements to be admissible at trial.[41] Our review of
the record leads us to the conclusion that the trial
court's determination that there was neither a formal
arrest nor a restraint on liberty approximating the cir-
cumstances that surround a formal arrest, and hence,
no custody, has ample support. In resolving the facts
critical to the custody issue, the trial court concluded
that "[t]he more credible evidence is that the defendant
was told several times that he was free to leave, that
he was not under constant or threatening observation
and that he was never restrained physically in any way."
The trial court also noted that the defendant had told
his mother-in-law upon returning home that he had
known that he could terminate the interview and leave
the police station at any time. This added credibility to
the assertions of the police that the defendant had been
told that he was not in custody and was free to leave.
*State* v. *Northrop*, supra, 213 Conn. 416 (defendant's
subjective belief that he was not in custody has "special
significance" in assessing degree of restraint actually
imposed); *State* v. *Derrico*, 181 Conn. 151, 159, 434 A.2d
356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed.
2d 607 (1980) (same). Given the defendant's freedom of
movement about the police station and the fact that he
had been repeatedly told that he was free to leave, we
conclude that the defendant was not in custody. *State*

---

[41] The trial court concluded that, even if the defendant was in custody,
he had knowingly and voluntarily waived his *Miranda* rights. The defendant
appears to concede that he was read and waived his *Miranda* rights when
he first arrived at the police station. He claims, however, that the waiver
became invalid at the moment that his situation became custodial, i.e., when
he first admitted responsibility for the victim's death. Even if we were to
agree with the defendant that his situation became custodial at that point,
we are not persuaded that the police would have been obligated to repeat
his precustodial *Miranda* warnings because there were no intervening cir-
cumstances that would have rendered his precustodial waiver ineffective.
See *State* v. *Burge*, 195 Conn. 232, 249, 487 A.2d 532 (1985).

v. *Northrop,* supra, 415 (reasonable person would feel free to leave when repeatedly told he or she could do so); see *State* v. *Greenfield,* 228 Conn. 62, 71 n.10, 634 A.2d 879 (1993) (important factor distinguishing consensual encounter from seizure is whether police expressly informed defendant he was free to leave).

The defendant urges us to conclude, however, that as soon as he implicated himself in the crime in his first statement, his status became custodial because, at that point, no reasonable person would have felt free to leave. While we agree that admissions of culpability may lead the police either to arrest a suspect or to place restraints on his freedom approximating an arrest, the police in this case never altered the circumstances of their interviews of the defendant in such a way that his initial noncustodial status became custodial. The defendant was never physically restrained in any way, was told repeatedly that he could leave, was allowed unrestrained and unaccompanied movement about the police station during his stay and indeed was allowed to leave when the interviews were completed. See *Oregon* v. *Mathiason,* supra, 429 U.S. 493–94. Furthermore, the defendant, according to both his own testimony and that of the police, never asked to leave or requested a ride home. *State* v. *Greenfield,* supra, 228 Conn. 69 (factor in determining whether defendant was seized); *State* v. *Damon,* 214 Conn. 146, 148, 570 A.2d 700, cert. denied, 498 U.S. 819, 111 S. Ct. 65, 112 L. Ed. 2d 40 (1990) (factor in determining whether defendant was in custody). The defendant also had had previous experience with the police wherein he had been interviewed and allowed to leave the police station. See *State* v. *Pittman,* supra, 209 Conn. 607. In light of the totality of the circumstances, we agree with the trial court that the defendant was not in custody for *Miranda* purposes during his interviews at the Manchester police station on July 4 and 5, 1989.

## B

We still, however, must determine whether the defendant's statements were voluntary under the federal constitution.[42] The state bears the burden of proving the voluntariness of the defendant's confession by a preponderance of the evidence. *Lego* v. *Twomey*, 404 U.S. 477, 484, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); *State* v. *Madera*, 210 Conn. 22, 39, 554 A.2d 263 (1989). "The trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . *State* v. *Atkinson*, supra, 235 Conn. 759. On the ultimate issue of voluntariness, however, we will conduct an independent and scrupulous examination of the entire record to ascertain whether the trial court's finding is supported by substantial evidence. . . . *State* v. *Chung*, [202 Conn. 39, 54, 519 A.2d 1175 (1987)]; see *Miller* v. *Fenton*, 474 U.S. 104, 112, 106 S. Ct. 445, 88 L. Ed. 2d 405 (1985) (although trial court's findings on subsidiary facts entitled to presumption of correctness under 28 U.S.C. § 2254 [d], ultimate determination of voluntariness is subject to independent review); *Mincey* v. *Arizona*, [437 U.S. 385, 398, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978)] (trial court's voluntariness determination subject to independent review); cf. *State* v. *Whitaker*, 215 Conn. 739, 753, 578 A.2d 1031 (1990) (in determining whether defendant voluntarily waived his *Miranda* rights, court defer[s] to trial court's findings on subsidiary factual questions, as compared with the ultimate legal finding of voluntariness)." (Internal quotation marks omitted.) *State* v. *James*, 237 Conn. 390, 411–12, 678 A.2d 1338 (1996).

Under the due process clause of the fourteenth amendment, in order for a confession to be deemed

---

[42] The defendant does not raise an independent state constitutional claim. See footnote 12.

"involuntary" and thus inadmissible at trial, "[t]here must be police conduct, or official coercion, causally related to the confession . . . ." *State* v. *Byrd*, 34 Conn. App. 368, 379, 641 A.2d 818 (1994), aff'd in part, 233 Conn. 517, 521, 659 A.2d 1201 (1995). In *Colorado* v. *Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986), the United States Supreme Court upheld the admission into evidence of a confession that Connelly had given, ostensibly as a result of hearing "voices" that urged him to confess to the unsolved murder of a young girl. At the urging of these voices, Connelly traveled from Boston, Massachusetts, to Denver, Colorado, approached a police officer on the street and expressed his desire to confess to the murder. After twice being read his *Miranda* rights, Connelly explained that he had killed a young girl in Denver nine months earlier, provided details of the crime and directed the police to the crime scene. Id., 160–61. Although Connelly suffered from chronic schizophrenia and was experiencing "command hallucinations" that interfered with his volitional abilities at the time of his confession, the court held that absent state action causally related to Connelly's decision to confess, such impairment was irrelevant to the voluntariness of his confession under the due process clause. "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law. . . . [There is an] essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other." Id., 164–65. The central holding of *Connelly* is that "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." Id., 165. The court declined to adopt a new constitutional right, namely, "the right of a criminal defendant to confess to his crime

only when totally rational and properly motivated." *Id.,* 166. *Connelly* requires that we consider the totality of the circumstances surrounding a defendant's confession to determine whether it was the product of the defendant's own volition, no matter how impaired; *id.,* 165; or "whether pressures exerted by officials have overborne the suspect's will, considering both the conduct of the officials and the capacity of the subject to resist pressure." *Evans* v. *Dowd,* 932 F.2d 739, 741 (8th Cir. 1991).

In concluding that the defendant's statements were voluntary, the trial court emphasized that the defendant was unaware of most of the potentially coercive police contrivances. See footnote 16. Moreover, the trial court found that the defendant was not in any way physically restrained or denied any physical comfort, nor was he threatened in any way or offered any inducements to confess. The trial court also noted that the defendant is a middle-aged man with an average IQ who is able to read and write and to support his family. See *State* v. *Toste,* supra, 198 Conn. 584 (confessions of mildly retarded defendant with IQ in 68 to 71 range held voluntary). According to his own experts, the defendant is not mentally retarded and suffers from no thought disorder or psychosis. According to many who know him, the defendant is able to assert himself and to confront others and is not easily led. For purposes of its opinion, the trial court assumed that the defendant suffered from dependent personality disorder as claimed by his experts but nonetheless concluded that this condition did not cause him to succumb to any police pressure. In light of these facts, the trial court determined that, "considering the totality of the circumstances surrounding the defendant's giving the confessions . . . the conduct of the police officers did not overbear the defendant's will to resist and bring about confessions not freely self-determined. The state has met its burden

of proof by a preponderance of the evidence that all confessions made by the defendant to members of the Manchester police department on July 4, 1989, were voluntarily made and were not the product of police coercion." We agree.

The defendant emphasizes the various psychological ploys devised by the police to induce him to admit his guilt, despite the uncontroverted testimony from him as well as from the state's witnesses that he was unaware of those contrivances.[43] See footnote 16. In determining whether coercive police activity caused the defendant to confess, however, our inquiry is necessarily limited to that police conduct of which the defendant was aware and that had the potential to overbear his will. See *State* v. *Barrett*, 205 Conn. 437, 453, 534 A.2d 219 (1987) (fruitless attempts at coercion irrelevant to voluntariness inquiry). In this case, there are only two such factors: (1) Lombardo's statement to the defendant that the defendant's fingerprints had been found on the knife handle at the victim's apartment; and (2) the length of the defendant's interrogation. We are unpersuaded that either Lombardo's false statement or the length of the interrogation overbore the defendant's will or had any causal relationship to his giving his statements.

It is undisputed that Lombardo told the defendant that the defendant's fingerprints had been found on the handle of the knife used to stab the victim, even though

[43] The trial court did find, in accordance with Lombardo's testimony, that the defendant had noticed two photographs of the victim in the detective division office when he walked through it with Lombardo despite the defendant's testimony that he did not recall seeing them. The record does not reflect when these photographs had been taken. We are unable to conclude that the defendant's brief viewing of two photographs of the victim overbore his will and produced a confession that was not the product of his own volition. The defendant never mentioned the photographs to Lombardo again after first seeing them, the photographs were in his view for only a few seconds, and Lombardo never mentioned them to the defendant.

no prints had actually been found. Such statements by the police designed to lead a suspect to believe that the case against him is strong are common investigative techniques and would rarely, if ever, be sufficient to overbear the defendant's will and to bring about a confession to a serious crime that is not freely self-determined, particularly if, as here, there was only one false representation made. *Frazier* v. *Cupp*, 394 U.S. 731, 739–40, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969) (false police statement that associate had confessed insufficient to make otherwise voluntary confession involuntary); *Evans* v. *Dowd*, supra, 932 F.2d 741 (statements of disbelief and untrue suggestions of eyewitnesses did not render confession involuntary); *Norman* v. *Ducharme*, 871 F.2d 1483, 1488 (9th Cir. 1989) (untrue statement that codefendant confessed did not render confession involuntary); *Hawkins* v. *Lynaugh*, 844 F.2d 1132, 1140 (5th Cir. 1988) ("trickery" alone does not necessarily invalidate confession); *United States* v. *Castaneda-Castaneda*, 729 F.2d 1360, 1363 (11th Cir. 1984) (false statement that codefendant had confessed insufficient to render confession involuntary); *State* v. *Cobb*, 115 Ariz. 484, 490, 566 P.2d 285 (1977) (false statement that defendant's prints had been found at scene insufficient to render confession involuntary); *State* v. *Galloway*, 133 N.J. 631, 655, 628 A.2d 735 (1993) (police deceit does not, by itself, render confession involuntary); see also 3 W. Ringel, Searches and Seizures, Arrests and Confessions (2d Ed. 1996) pp. 25-25–26 (falsehoods regarding status of case widely accepted by courts).[44]

---

[44] Although we find no causal relationship between the defendant's confession and the police conduct under the facts of this case, we note that "[e]ven where there is causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a violation of the Due Process Clause. See, e.g., *Frazier* v. *Cupp*, [supra, 394 U.S. 739]." *Colorado* v. *Connelly*, supra, 479 U.S. 164 n.2. For instance, in *Frazier*, even if the defendant would not have confessed but for the police statement about his associate's inculpatory remarks, the confession was not thereby rendered involuntary. The inquiry is not merely

Moreover, as the defendant himself testified at trial, he was not concerned that the police may have found his fingerprints at the victim's apartment because of his frequent visits there. We are persuaded that Lombardo's fabrication regarding the fingerprints on the knife handle did not in any way compel the defendant to confess against his will to the sexual assault and murder of his wife's grandmother and the arson of her apartment. Without a causal connection, even the most egregious police misconduct will not render a confession involuntary under the due process clause. *Colorado* v. *Connelly*, supra, 479 U.S. 165 ("essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other"); *United States* v. *Guerro*, 983 F.2d 1001, 1004 (10th Cir. 1993) (same); *Norman* v. *Ducharme*, supra, 871 F.2d 1488 ("confession . . . not induced by any false statement"); *Green* v. *Scully*, 850 F.2d 894, 903–904 (2d Cir. 1988) ("motivation for Green's confession . . . resulted not from this or any other police conduct" but, rather, from his desire to prevent himself from hurting others, including his own mother); *Commonwealth* v. *Williams*, 537 Pa. 1, 18, 640 A.2d 1251 (1994) ("[a]ppellant has failed to demonstrate how his confession was caused by the [false] statements of the police").

We are also unpersuaded that the length of the defendant's interrogation was sufficient to overbear his will and to compel him to give statements concerning the crimes with which he was eventually charged. It is undisputed that the defendant was at the police station

whether the defendant would have confessed "but for" the police conduct, but, rather, whether the particular defendant's capacity to resist the police pressure was overborne. See *State* v. *DeAngelis*, 200 Conn. 224, 232–33, 511 A.2d 310 (1986) (coercive police conduct must overbear defendant's "will to resist and bring about confessions not freely self-determined" [internal quotation marks omitted]). If the police conduct is insufficient to overcome the defendant's capacity to resist but the defendant still elects to confess, due process is not offended. Id.

in Manchester from approximately 3:45 p.m. on July 4, until between 12:30 and 1:30 a.m. on July 5. "The mere fact that admissions are made by an accused after a long period of interrogation by a police officer does not necessarily mean those admissions are involuntary." *State* v. *DeAngelis*, supra, 200 Conn. 235 (ten and one-half hour police interview). In this case, the trial court found, and the record confirms, that the defendant went to and remained at the police station voluntarily, that he was allowed to use the bathroom when he requested to do so, was given food when he said that he was hungry and was loaned a jacket when he advised the police that he was cold. He also indicated to family members after he arrived home that he was aware that he could have left the police station at any time and that he had stayed at the station so long because he and the police officers, some of whom he knew on a personal basis and with whom he had spoken informally many times in the past, "were just talking." Moreover, several of the defendant's damaging oral admissions and his first two written statements were made within the first four hours of his visit to the police station. The defendant's refusal to admit his guilt to Brooks during the final thirty minutes of his stay at the police station also indicates that the defendant's will had not been subverted to that of his interrogators. See id., (defendant's refusal to give written statement and refusal to be fingerprinted indicate will not subverted). Finally, the defendant was apprised of and knowingly waived his *Miranda* rights before giving any statements, a circumstance that is relevant to a finding of voluntariness. *Withrow* v. *Williams*, 507 U.S. 680, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993); *Frazier* v. *Cupp*, supra, 394 U.S. 739.

The defendant testified repeatedly that the reasons that he incriminated himself were that he wanted to use the bathroom and that he wanted to go home. The

trial court, however, made a factual determination, which we are bound to accept because it is supported by the record and is not clearly erroneous, that the defendant was not, at any point during his stay at the Manchester police station on July 4 and 5, 1989, denied "any physical comfort, food, drink or bathroom facility." The trial court also found as a factual matter that the defendant had not been threatened in any way by the police and that he had not been physically restrained or prevented from leaving the police station. These factual determinations are well supported by the record. Because there is no evidence that the defendant's will was overborne or that his incriminating statements were the product of either subtle or overt police pressures, we conclude that the statements were voluntary within the meaning of the fourteenth amendment and properly admitted at his trial.[45]

## II

The defendant next claims that his right to due process under article first, § 8, of the state constitution was violated because the state was allowed to introduce at trial evidence of his statements to the police even though those statements had not been electronically recorded. This claim is rejected based on our recent opinion in *State* v. *James*, supra, 237 Conn. 428–34, in which we held that electronic recording of confessions is not a prerequisite to their admissibility at trial under article first, § 8, of the state constitution.

---

[45] We emphasize that the trial court's conclusion that the defendant's statements were voluntary did not foreclose him from presenting evidence at trial of the circumstances surrounding the giving of the statements. "The defense was free to present to the jury evidence of the defendant's mental condition at the time of the interview, which under these facts goes to the weight and reliability, not the admissibility, of the defendant's statements." *United States* v. *Robertson*, 19 F.3d 1318, 1322 (10th Cir. 1994). The defendant in this case sought to convince the jury that his statements were unreliable by presenting evidence of his mental abilities and his version of the events surrounding the giving of his oral and written incriminating statements. Whether his statements were reliable, therefore, was grist for the jury's mill.

## III

The defendant's final claim is that the trial court improperly declared a state's witness unavailable and allowed the prosecution to play an audiotape of the witness' suppression hearing testimony in lieu of his live testimony at trial. We disagree.

The following facts are necessary to resolve this issue. Brooks, the commanding officer of the detective division of the Manchester police department at the time the defendant gave his statements, testified on direct examination at the suppression hearing that he had known the defendant personally for some time, that he had been the last officer to interview the defendant on July 4 and 5, 1989, that the defendant admitted to having had a vasectomy and that the defendant would neither confirm nor deny that the defendant had sexually assaulted and killed the victim. After his brief direct examination by the state, Brooks was thoroughly cross-examined by the defendant's attorney.

During the defendant's trial, the state informed the court that Arthur Landry, Jr., a cardiologist, had submitted a letter to the state's attorney's office stating that Brooks, who was to be a witness for the state, would be unavailable to testify for medical reasons. The court ordered a hearing to determine Brooks' availability. At the hearing, Landry testified that Brooks was scheduled to undergo an angioplasty in the next week to alleviate a severe narrowing of a cardiac artery. Landry stated that if Brooks were to testify at the trial before undergoing the angioplasty, the stress induced thereby might cause Brooks to develop angina[46] and potentially to suffer a heart attack. Landry further testified that Brooks might be able to testify safely three weeks after

---

[46] Landry described angina as "a symptom produced by a lack of blood supply to the heart muscle."

the angioplasty, depending, however, upon stress test results.

The defendant argued that Landry's testimony was inadequate, as a matter of law, to establish Brooks' unavailability and that a heart monitor could be set up in the courtroom to monitor Brooks' condition or, in the alternative, that if Brooks were presently unavailable, the court should recess "for at least a period of three weeks." The court, however, declared Brooks unavailable under the relevant case law and found that his prior testimony bore "sufficient indicia of reliability, specifically that it was given under oath, under the penalty of perjury, in the courtroom setting, at a formal hearing, with full opportunity for cross-examination by defense counsel." The court then denied the defendant's motion for a three week continuance and ordered the tapes of Brooks' suppression hearing testimony to be played to the jury.

"[T]his court and the United States Supreme Court have declared that prior testimony of an unavailable witness is admissible in a subsequent trial as an exception to the hearsay rule. *Ohio* v. *Roberts*, 448 U.S. 56, 67, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980); *California* v. *Green*, 399 U.S. 149, 165, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970); *State* v. *Parker*, 161 Conn. 500, 503–504, 289 A.2d 894 (1971)." *State* v. *Torres*, 210 Conn. 631, 645–46, 556 A.2d 1013 (1989). The two part test for the admissibility of such testimony is as follows: " 'First . . . [t]he prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.' [*Ohio* v. *Roberts*, supra, 65]. Even after the declarant is satisfactorily shown to be unavailable, 'his statement is admissible only if it bears adequate "indicia of reliability" '; id., 66; which serve to 'afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement.'

*California* v. *Green,* [supra, 160–61]." *State* v. *Outlaw,* 216 Conn. 492, 505, 582 A.2d 751 (1990).

In *State* v. *Frye,* 182 Conn. 476, 481, 438 A.2d 735 (1980), we identified five of the most common situations in which the declarant will be deemed unavailable for the purposes of certain hearsay exceptions, one of which is where the declarant "is unable to be present or testify [at the hearing] because of death or existing physical or mental illness or infirmity." The trial court has broad discretion in determining whether the proponent has shown a declarant to be unavailable. A trial court's determination of the unavailability of a witness will be overturned only if there has been a clear abuse of discretion. *State* v. *Rivera,* 221 Conn. 58, 62, 602 A.2d 571 (1992). Likewise, a trial court's decision not to grant a continuance will not be overturned absent an abuse of discretion. *State* v. *Hamilton,* 228 Conn. 234, 239, 636 A.2d 760 (1994). Every reasonable presumption must be made to sustain the trial court's proper exercise of its discretion. *State* v. *McKnight,* 191 Conn. 564, 576–77, 469 A.2d 397 (1983).

In light of the severity of Brooks' physical infirmity and its accompanying uncertain prognosis, we conclude that the trial court did not abuse its discretion in finding him to be unavailable due to physical illness. We also conclude that the trial court did not abuse its discretion in finding that Brooks' former testimony was reliable. As the trial court noted, at the suppression hearing Brooks had testified under oath in an adversarial proceeding and had been subjected to thorough cross-examination by defense counsel. Moreover, the defendant does not claim now that Brooks' former testimony was unreliable.[47]

---

[47] The defendant claims that the state failed to use due diligence to produce Brooks at trial; *State* v. *Summerville,* 13 Conn. App. 175, 181, 535 A.2d 818 (1988) ("[a]ll that is required by the proponent of the hearsay testimony is a good faith effort to procure the declarant's attendance"); in that the state

The judgment is affirmed.

In this opinion PETERS, C. J., and BORDEN, NOR-COTT and PALMER, Js., concurred.

BERDON, J., with whom KATZ, J., joins, dissenting. I do not know if the defendant, Richard Lapointe, sexually assaulted and murdered his wife's eighty-eight year old grandmother, but I do know that the circumstances surrounding his admissions and confessions, which substantially contributed to his conviction, are suspect. This case underscores the necessity for requiring the state to prove beyond a reasonable doubt, rather than by a mere preponderance of the evidence, that an admission or a confession obtained by the police through an interrogation was not coerced.

In this case, the defendant's confession was procured more than two years after the victim's assault and murder, and after nine hours of continuous interrogation by the police on July 4–5, 1989. Even after this extensive period of questioning, the police were unable to stop the defendant from vacillating and were unable to pro-

was under a duty to inform the court of Brooks' unavailability earlier so that the trial schedule could be adjusted to accommodate Brooks' medical needs. This argument founders on its premise that the state acted in bad faith by not disclosing information about Brooks' condition, perhaps as a tactical decision to prevent Brooks from testifying. The record reveals that the state had intended to call Brooks as its first witness on May 27, 1992, and that the state fully expected Brooks to appear on that day. The record also indicates that the first time that the state became aware of any potential unavailability problem with Brooks was sometime after 5 p.m. on May 26, 1992, when the state received a faxed letter from Landry. The state immediately telephoned Landry's office and left a message. In court on May 27, the state indicated that it felt Landry's letter to be insufficient to demonstrate Brooks' unavailability and that it intended to serve a subpoena on Landry that afternoon requiring his appearance in court the next day. Landry appeared pursuant to that subpoena, and was examined by both parties regarding Brooks' medical condition. The defendant's suggestion that the state acted in bad faith is entirely unsupported by the record. See Practice Book § 4184 (5).

cure an unequivocal statement.[1] Furthermore, the defendant's mental ability to knowingly and intelligently confess while being interviewed by the police is questionable given the fact that he has been diagnosed as having an unduly submissive personality, as hereinafter described, which is consistent with Dandy Walker Syndrome[2] from which he suffers. At the age of fifteen, the defendant was diagnosed with this syndrome. Treatment required that a shunt be implanted in his brain to relieve the intercranial pressure that had been mounting. Four additional surgeries were subsequently needed to ameliorate the defendant's condition.

The defendant was examined by Anne M. Phillips, a clinical psychologist, and Kenneth M. Selig, a psychiatrist, both of whom testified at the defendant's suppression hearing and whose reports were admitted into evidence. Phillips observed in her report that the defendant "is inclined to sometimes respond arbitrarily to conversation or questions [that] he does not fully understand. [He] tends to be quite concrete and inflexible in his reasoning, understanding situations in a narrow and set way, and having considerable difficulty

---

[1] Among his equivocations is the defendant's second statement:

"I, Richard A. Lapointe, do hereby give the following statement to Detective Paul R. Lombardo of my own free will, free of any threats or promises that:

"On March 8, 1987, I went to visit Bernice Martin with my wife and son. We left the apartment in the late afternoon and went home. I left my house sometime after that to take the dog for a walk.

"I was at Bernice's apartment with the dog. We were both there together and the time was right. I probably made a pass at her and she said no. So I hit her and I strangled her.

"*If the evidence shows that I was there, and that I killed her, then I killed her, but I don't remember being there.*

"I made a pass at Bernice because she was a nice person and thought that I could get somewhere with her. She was like a grandmother to me, that I never had." (Emphasis added.)

[2] In his diagnostic report of the defendant, Kenneth M. Selig, a psychiatrist, defined Dandy Walker Syndrome as "a congenital deformity of the bones at the base of [the] skull."

adopting alternative interpretations of events, or even making sense of unfamiliar events. He tends to be confused by a multiplicity of stimuli, whether dealing with verbal or non-verbal situations, and to then respond in a rather disorganized fashion. . . . He is, in sum, a man functioning at the lower end of the average range of intelligence who demonstrates particular difficulty with cognitive flexibility, expressive and receptive vocabulary, and with detail discrimination. Although able to manage many everyday tasks, [the defendant] is narrow, concrete and inflexible in his learning and functioning ability and apt to be rigid and easily frustrated in dealing with unfamiliar situations. . . . Neuropsychological testing demonstrates the presence of attentional and sequencing deficits, dysnomia, perseverative errors, impulsivity, significant constructional deficits, evidence of proactive inhibition and impaired facial memory. [The defendant's] pattern of deficits on neuropsychological deficits were seen as consistent with right frontal and posterior cerebral dysfunction, as well as with the experience of Dandy Walker Syndrome with multiple cerebral shunts." Phillips concluded that the defendant "is easily overwhelmed by emotions or by unfamiliar situations and seeks to limit his experiences in order to avoid such discomfort. When thus overwhelmed, [the defendant] is likely to defer to environmental cues over his own judgment in order to find a quick way out of the discomfort he experiences. [The defendant] appears extremely reactive to authority, tending both to rely upon authority figures for guidelines for behavior and to be intimidated and easily threatened by them. . . . While not thought disordered, the interplay of [the defendant's] cognitive and emotional limitations severely constrict his capacity for coping with situations which are novel or at all stressful or emotionally-charged."

Selig's report[3] reflected similar observations: "[The defendant] is an easily intimidated, slow witted, highly

[3] Selig's extensive report, which was admitted into evidence at the suppression hearing, set forth the defendant's characterization of his July 4, 1989 interrogation, the attempts made by the defendant's father-in-law and his brother-in-law to contact him and his mother-in-law's (the victim's daughter) description of the defendant's submissive personality: "Richard does not recall any other contact with the police until July 4, 1989, 28 months later. He was preparing for a cookout when the police called. This was late in the afternoon at around 4:30 p.m. The police asked him to come down and he complied because he thought it would only last a short while and he could still be home for the cookout. He told his wife that he was going because 'the police wanted to clear things up.' He said that he was interrogated by one police officer for a couple of hours and that the police officer kept repeating the same question 'did you kill Mrs. Martin?' 'I kept telling the police I didn't do it and they kept saying "you did it" so finally I said "what do you want me to say, that I did it?" and they said "ah, hah, see you confessed." I said "I didn't confess." They kept saying the same thing over and over.' He said that he was unable to use the bathroom for one or two hours after saying that he needed to. He said that he was read his rights and he recalls signing a statement to that effect. He stated that he felt intimidated 'that he might smack me if I didn't do what he said.' He had not met the police officer [Detective Paul Lombardo] prior to that day and had never had his rights read to him before that. He said that after Officer Lombardo interviewed him, Detective [Michael] Morrissey took over and told him that he had been to his house to talk with his wife 'and your wife says she still loves you. We're going to ask you some questions and if your answers don't agree with what your wife said, we'll have your wife put in jail and your son taken away.' Richard stated 'that scared the hell out of me. I believed him. I'd never really been in trouble in my life. He asked how I killed her. Immediately I began confessing because I didn't want my wife to go to jail or my son to be taken away. I took what I told them I did from what he was saying to me. Whatever he told me I supposedly did, I agreed to. I was just making a confession so I could get out of there and go home.' Richard recalls Captain [Joseph] Brooks subsequently talking to him. Richard knew Captain Brooks. Richard said that Captain Brooks wanted to talk to him 'just as a friend, he said. I asked him if there was going to be more questioning and he said "no, I'm not going to question you." He wanted to know why I had only one child and I told him I'd had a vasectomy.'

"Richard stated that he kept telling the police that he did not do it but that they had pushed him. As I confronted him to explain how he could have confessed to a murder and a rape that he did not do, he said that he was concerned about his wife and son and that he became easily confused. He was unable to say how he thought that his confessing would help his wife except that it might correlate with what she had said. Essentially, he

**submissive individual who is extremely vulnerable to the pressure tactics used on him by the police . . . .**

does not have a clear idea why he confessed falsely. He said 'maybe I was frightened, I'd never been in a police station before.' He acknowledged that he was scared and that he felt intimidated. He stated 'if I'd said the wrong thing, they'd probably arrest me.' He noted that he wanted desperately to get out of the police station and 'I figured if I said something—they'd say ok you can go home. All I was thinking of was my son and my wife. I wasn't even thinking of what the consequences [were]. I was just saying what they wanted me to say so I could get out and spend time with my wife and my son on the holiday. I felt like I wanted to get out—I didn't belong there—I'd no business being there.' He had not understood that he was free to leave when he was at the police station and he said that he was not told that he could leave until it was the end of the interview.

"Richard told me that he was not worried when he left the police station even though he had just confessed to a brutal crime that could potentially carry the death penalty. Indeed, he wondered aloud to me 'should I have been?' He said 'I was just thinking of getting home with my wife and son. I wasn't thinking about being arrested. I didn't even think I'd confessed to a crime. I'd just been talking with Morrissey. I was just answering his questions. I didn't think Morrissey would really take me seriously.' He said that he slept well that night as usual and got up the next morning and went to work as an ordinary day. His wife and son went to New Hampshire for the week of vacation that they had planned. When he got home from work, the police came to his house at about 5:00 p.m. and placed him under arrest. He said that during that day (July 5, 1989) he had been unconcerned and not worried that he would be arrested. He at no time thought about talking to a lawyer even after he had confessed. He apparently had no understanding of the seriousness of his confession and believed that the police would recognize that it was simply his effort to get out of the police station and get home to his family. The next day 'I'd forgotten all about the confession. I had to work. I had a family to support. It was like any other day. When I got home from the police department, I forgot all about it. I was home with my wife and felt safe. That night my wife and my mother-in-law were behind me.'

"Richard's wife and his in-laws met with his attorney's investigator on two occasions later in July of 1989. Transcripts from those meetings reveal the following: Richard's wife related that on July 4, 1989, at around 4:00 p.m. Richard went to the police department and was not released until approximately 2:00 a.m. on July 5 (roughly ten hours later). She said that he related that they kept asking the same thing over and over. She said that according to Richard he did ask for a lawyer but was told by the officers 'no.' He also asked if he could make a [tele]phone call and again he was told no. Richard also told his wife that the officers kept threatening that if he did not talk, his wife would get arrested and their son would have to go to the State. Richard told his wife that at around midnight the officers did tell him he could leave but they kept on talking to him and he could not

His lack of education, low intelligence, lack of experience with the police, personality tendency to be compliant and obedient, the repeated and prolonged nature of the interrogation, and the coercive remarks of the police that his wife and son might be arrested or taken from him if he did not confess all resulted in his providing a confession which was [given] under duress and not voluntary."

Both in this case and in our recent case of *State v. James*, 237 Conn. 390, 678 A.2d 1338 (1996), the defendants argued that in order to ensure that a confession procured by the police is voluntary, the state constitution requires that police interrogations be electronically recorded. I agree with the majority that such a procedure is not required by our state constitution.[4]

Nevertheless, closely related to the policy considerations supporting electronic recordation of police inter-

leave. Richard's mother-in-law [*the daughter of the victim*] expressed to his attorney's investigator her concern over what may have been done to Richard as she feels that he can be easily influenced to say things that he may not really believe. She explained that Richard's mentality is such that people can easily influence him. She also noted that she and her husband had made several telephone calls to the Manchester police department inquiring about Richard and the reasons for Richard's being held. Her husband and her son, Ken Martin, did go to the police department and she subsequently called the police department to ask if she should hire an attorney for Richard and was told that it was up to her but that it was not necessary as they were only interviewing Richard and that there was nothing an attorney could do. Richard's wife told the investigator that while Richard was at the police station on July 4, a detective (probably Detective Morrissey) was at her house attempting to get information from her. Richard's mother-in-law later stated that her husband and son went to the police station and asked to take Richard home but the police refused on the grounds that he was being interviewed. This was around 10:00 p.m. They returned at about 12:30 a.m. and sat and waited for Richard until about 2:00 a.m. when he was finally released." (Emphasis added.)

[4] The defendant in this case does not argue that, under our supervisory powers, we should adopt this requirement for all future cases. See *State v. Halloway*, 209 Conn. 636, 645-46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989) (this court has "inherent supervisory

rogations is the issue of the state's burden of proof with respect to the voluntariness of a confession. The majority of this court recently held that the state need only establish the voluntariness of a confession by a preponderance of the evidence—that is, it was more probable than not that the confession was voluntary. Id., 425–26. Although the defendant does not explicitly raise the issue of the state's burden of proof, he does challenge whether there is "substantial evidence in the entire record [that] supports the trial court's finding of a valid waiver [of counsel] and voluntary confession." Because I continue to believe that the state bears this heightened burden of persuasion; id., 445 (*Berdon, J.*, dissenting); I would order a new trial and require that the state prove beyond a reasonable doubt that the defendant's confession was voluntary.

I include by reference my state constitutional analysis as set forth in *State* v. *James*, supra, 237 Conn. 445–53 (*Berdon, J.*, dissenting). Certain policy concerns favoring the adoption of the reasonable doubt standard that were discussed in that dissent, however, merit reiteration. "Burdens of proof are allocated upon the willingness of society to accept the risk of an erroneous determination. For example, [w]e permit proof by a preponderance of the evidence in civil litigation because we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor. . . . *Lego* v. *Twomey*, 404 U.S. 477, 493, 92 S. Ct. 619, 30 L. Ed. 2d 618 (Brennan, J., dissenting).

"On the other hand, in a criminal matter we require proof beyond a reasonable doubt. The Supreme Court of the United States pointed out in *In re Winship*, 397 U.S. 358, 363, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970), that the reasonable doubt standard is a prime instrument for

authority over the administration of justice"). Accordingly, I leave this issue for another day.

reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence . . . . As Justice Harlan stated in his concurring opinion, the requirement of proof beyond a reasonable doubt in a criminal case [is] bottomed on a fundamental value determination of our society that it is far worse to convict an innocent [person] than to let a guilty [person] go free. Id., 372.

"I am unwilling to accept the risk of an erroneous determination that the confession was voluntary when in fact it may have been coerced. If we permit the prosecution to prove by a preponderance of the evidence that a confession was voluntary, then, to paraphrase Mr. Justice Harlan, we must be prepared to justify the view that it is no more serious in general to admit involuntary confessions than it is to exclude voluntary confessions. . . . Compelled self-incrimination is so alien to the American sense of justice that I see no way that such a view could ever be justified. *Lego* v. *Twomey,* supra, 404 U.S. 494 (Brennan, J., dissenting).

"The majority today places a confession on the same level as any other evidential ruling during the course of a trial. This fails to recognize that confessions are a special type of evidence. *State* v. *Trammell,* 240 Neb. 724, 736–37, 484 N.W.2d 263 (1992); *State* v. *Phinney,* 117 N.H. 145, 147, 370 A.2d 1153 (1977). As the *Phinney* court recognized: Confessions are usually obtained in the psychological atmosphere of police custody and in the greatest secrecy in which the cards can be stacked against the accused. He has no means of combating the evidence produced by the police save by his own testimony. The stakes are too high and the risk of error too great to permit a determination of admissibility to be decided by a balance of probabilities. *State* v. *Phinney,* supra, 147.

"The need for the heightened standard of proof beyond a reasonable doubt that a confession was volun-

tary is underscored by a fundamental principle of our criminal justice system—that no one shall be found guilty of a crime except upon proof of every element of the crime beyond a reasonable doubt. *In re Winship*, supra, 397 U.S. 364. Anyone who has had any experience with the criminal justice system and the trial of a criminal case—either as a judge or trial counsel—knows that the confession once admitted is tantamount to conviction. *State* v. *Phinney*, supra, 117 N.H. 147 (acceptance of confession basically amounts to conviction). Because our system of justice is predicated on the reasonable doubt standard, it then logically follows that the voluntariness of a confession must be established by proof beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *James*, supra, 237 Conn. 445–47 (*Berdon, J.,* dissenting).

For the above reasons, including my detailed historic analysis that is set forth in *James*, I believe that the state constitution requires the state to prove the voluntariness of a confession beyond a reasonable doubt. In rejecting the standard of more probable than not, Connecticut would join those enlightened northeastern states, such as Maine, Massachusetts, New Hampshire, New York, New Jersey and Rhode Island,[5] that currently

[5] "Every state but one in the northeast has adopted a standard of proof in excess of the preponderance of the evidence to determine the voluntariness of a confession. See *State* v. *Collins*, 297 A.2d 620 (Me. 1972) (reasonable doubt); *Commonwealth* v. *Mandile*, 397 Mass. 410, 492 N.E.2d 74 (1986) (same); *State* v. *Benoit*, 126 N.H. 6, 490 A.2d 295 (1985) (same); *State* v. *Franklin*, 52 N.J. 386, 245 A.2d 356 (1968) (same); *People* v. *Huntley*, 15 N.Y.2d 72, 204 N.E.2d 179, 255 N.Y.S.2d 838 (1965) (same); *State* v. *Arpin*, 122 R.I. 643, 410 A.2d 1340 (1980) (clear and convincing). Other states have also come to the same conclusion adopting the reasonable doubt standard. *Snellgrove* v. *State*, 569 N.E.2d 337 (Ind. 1991); *Bradley* v. *Commonwealth*, 439 S.W.2d 61 (Ky. 1969), cert. denied, 397 U.S. 974, 90 S. Ct. 1091, 25 L. Ed. 2d 268 (1970); *Jones* v. *State*, 461 So. 2d 686 (Miss. 1984); *State* v. *Drayton*, 287 S.C. 226, 337 S.E.2d 216 (1985), overruled in part on other grounds, *State* v. *Torrence*, 305 S.C. 45, 70, 406 S.E.2d 315 (1991); *State* v. *Janis*, 356 N.W.2d 916 (S.D. 1984); *State* v. *Owens*, 148 Wis. 2d 922, 436 N.W.2d 869 (1989)." *State* v. *James*, supra, 237 Conn. 452–53 (*Berdon, J.,* dissenting).

require that the state prove, by a heightened standard of proof, the voluntariness of a confession. This case highlights the need for the state to prove the voluntariness of a confession beyond a reasonable doubt—the police interrogation of the defendant, who suffers from a mental impairment and an unduly submissive personality, for nine hours (commencing at approximately 4:30 p.m. and concluding at approximately 2 a.m.), which produced three equivocal and highly suspect confessions that were subsequently relied upon to convict him.

Accordingly, I dissent.