[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: MOTION TO SUPPRESSCT Page 7898 PURPORTED STATEMENTS OF DEFENDANT ON JULY 17, 1998
 I. INTRODUCTION
In a Motion to Suppress dated August 17, 2000, Chasity West, the defendant, moves to suppress as evidence . . . "any and all statements made by (the defendant)" at the Windsor Police Station on or about July 17, 1998, and statements attributed to the defendant later that same morning while the defendant was enroute to her court arraignment.
The defendant invokes the protections of the Fifth and Fourteenth Amendments to the Constitution of the United States, and Article First, § 8, of the Connecticut Constitution, and moves this court to suppress certain purportedly incriminatory statements of the defendant to police at the stationhouse on July 17, 1998 and enroute to her court arraignment that same day.
The defendant claims that she was subjected to custodial interrogation by the police and the alleged incriminatory statements were elicited by the police in the absence of the warnings required by Miranda v.Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); and thereby render the statements inadmissible.
The State claims the defendant was not in custody at the stationhouse up to the time of the incriminating statement and that the defendant was not the subject of interrogation on the ride to court and therefore the statements attributable to the defendant are not subject to Miranda protection and admissible.
 II. ISSUES
1. Was the defendant in custody at the time of the purportedly incriminating statement at the stationhouse whereby the protection of the Miranda warnings would attach? The answer is, No.
2. Was the defendant the subject of interrogation at the time of the purportedly incriminating statements enroute to the court arraignment whereby the protection of the Miranda warnings would attach? The answer is, No.
3. Were the purported statements of the defendant on each occasion voluntary? The answer is, Yes.
The Motion to Suppress the Purported Statements of the Defendant on CT Page 7899 July 17, 1998 at the stationhouse and enroute to court arraignment is denied.
 III. FINDINGS
After an evidentiary hearing the Court makes the following findings:
Detective James McGlynn ("McGlynn")[1] and Detective Debbie Swanson, as part of their investigation into the homicide of Jarrel Cuyler, met with the defendant on July 9, 1998, in the dining room of her home. The defendant's mother was present at this interview. During this interview the defendant was asked to trace her whereabouts on the night preceding the homicide, July 8, and the early morning hours of July 9, 1998. The defendant related to the officers that she arrived at Arnold Cuyler's house in Bristol at approximately 8:00 p.m. on July 8, 1998, and left at 1:00 a.m. on July 9, 1998. The defendant indicated that upon departing Arnold Cuyler's home she went directly to her residence in Windsor.[2]
McGlynn had interviewed the defendant a second time along with Det. Debbie Swanson on July 10, 1998 in the interview room of Windsor Police Department.
A. Statements Attributable to the Defendant at the Stationhouse
On July 16, 1998, McGlynn attempted to interview the defendant again. At approximately 11:00 p.m. on July 16, McGlynn proceeded to the defendant's residence. The defendant was not at home but her mother Joyce West was present. McGlynn conveyed to Joyce West that he wanted to speak with the defendant. Through the efforts of Joyce West, McGlynn was able to speak with the defendant on the telephone and advised her that he wanted to speak with her. The defendant indicated that she was at Arnold Cuyler's house, that she was coming home soon, and that she would be willing to speak to police. Upon being asked to stop by the Windsor Police Department the defendant indicated that was "no problem"[3] and that the stationhouse was "on the way" home.
The defendant arrived at the stationhouse at approximately 12:35 a.m. and was met by two detectives who requested and received the defendant's completion of a consent form authorizing the search of her vehicle.
The defendant was eventually escorted through the detective bureau to the interview room at approximately 12:55 a.m., where the defendant was met by McGlynn and Sgt. Mark Francis[4] ("Francis"). The defendant greeted both officers and specifically addressed Francis by his first name indicating "Hello, Mark," like they knew each other (according to McGlynn). At the time of her arrival the defendant was smiling and CT Page 7900 appeared "pretty willing," "outgoing" and "at ease."
The defendant entered the interview room with detectives McGlynn and Francis. The room was approximately 10 x 12 feet in area. The defendant selected a chair against the wall facing into the center of the room. There were two doors in the room only one of which was operable. To her right was a desk. McGlynn was sitting in a chair, facing the defendant, to her right. Francis was sitting in a chair to the defendant's left, facing her. At the beginning of the interview the officers were seated approximately five feet from where the defendant was seated. There was a window in the room which looked out into the office area. The venetian blinds were down but apparently in an open condition because one could see into the interview room.
Upon the defendant's arrival in the interview room the defendant was advised that she was not under arrest and that she was free to leave at any time.[5] The defendant indicated that she understood her situation. The officers indicated their desire to discuss further the death of Jarrell, and whether the defendant had any further information, other than that previously provided. She indicated she did not and that she wanted his killer caught.
In the defendant's initial interview on July 9 at her home, the defendant indicated to the police that at approximately 1:00 a.m. on July 9 she left Arnold Cuyler's home in Bristol and went directly home to Windsor and indicated the route she utilized to arrive home.
In the interim, prior to this July 17 interview of the defendant, the officers had developed information that was inconsistent with the defendant's initial representation of her movements in the early morning hours of July 9.[6]
After questioning by the police of her initial claim that she left Arnold Cuyler's residence in Bristol at 1:00 a.m. and went directly home, the defendant added that she did in fact stop at McDonald's. Upon further questioning the defendant again augmented her initial version by indicating an additional stop at Kentucky Fried Chicken. The defendant indicated to the officers that she then went directly home. Upon repeated inquiry the defendant indicated she went directly home after the Kentucky Fried Chicken stop.
The officers then asked whether the defendant stopped for gas on the way home. The defendant paused and indicated "Oh yeah, I stopped for gas." Further questioning identified the particular station as Marty's Mobil. When asked about the stop for gas the defendant appeared to be taken by the inquiry and "showing some concern." CT Page 7901
Up to the point in the interview when Marty's Mobil was mentioned, the defendant appeared calm and very confident. Upon the inquiry focusing on Marty's Mobil and the events that transpired there, the officers noticed that the defendant's demeanor changed whereby she became more anxious and more excited.
The defendant was asked to recount what transpired at Marty's Mobil and she indicated that she pumped $5.00 worth of gas and paid the attendant in cash. The defendant then indicated she got into her vehicle and went directly home.
The officers then inquired if she met anybody while at Marty's Mobil. The defendant responded that she had not. The officers repeated their inquiry about whether she was sure she did not meet anyone at Marty's. The defendant paused and indicated "Oh yeah, I met my cousin India's boyfriend, Alex. He has a weird last name. I can't pronounce it." At that time the officers supplied the name of "Alex Grajales" and the defendant responded that was the name.
Upon the name "Alex Grajales" being mentioned by the investigators, the defendant's demeanor did change further. She appeared "more and more nervous.
At this juncture the defendant related that Alex was at Marty's Mobil filling his car with gas, also. She indicated that she had a brief conversation with Alex about his efforts that morning to see India but he was unable to make contact. The defendant indicated that they each left Marty's in their respective vehicles and that she went directly home.
The defendant was asked whether anything else transpired at the gas station and the defendant responded, "No, that's it." At this point in the interview the defendant was shown a photograph of a Casio G-shock wristwatch.[7] Initially, the defendant indicated she did not recognize the watch and upon further inspection of the photograph the defendant indicated, "This looks like a watch Alex owned." The defendant further indicated that she knew this wristwatch could not have been Alex's because she had recently seen Alex wearing his wristwatch.
The defendant was then informed that Alex had provided police a statement and that he had recently purchased a new Casio G-shock wristwatch.
At this point in the interview the defendant augmented her version of what transpired between her and Alex at Marty's Mobil. The defendant indicated that Alex told her he was helping his friends who had run out of gas and that he was going to supply them with gas but that he had no CT Page 7902 container for the gas. The defendant indicated that she had several soda bottles in the back of her vehicle and she supplied Alex with a clear plastic two liter empty soda bottle. The defendant indicated that Alex pumped gas into the soda bottle she had provided. The defendant further added that Alex had no money for the gas so she, the defendant, paid for the gas that was pumped into the soda bottle. Upon further questioning, the defendant indicated that the soda bottle did not have a cap and she had a bag of cookies on the front seat of her vehicle and she provided this Chips-a-Hoy bag to Alex. The defendant related that Alex dumped some cookies out and utilized the cookie wrapper by twisting it to fashion a cork for the soda bottle.[8]
At that point of the interview when the officers indicated to the defendant that Alex had provided police a statement and that Alex told police he purchased a new watch, the officers noted a marked change in the defendant's demeanor: "It was almost to me like a light bulb turned on . . . it just appeared that she was really nervous." She was breathing heavy, she was squirming in her seat. . . . "she was just very, very more nervous." When the officers initially mentioned "Alex Grajales" the defendant "seemed to be concerned," "her answers seemed a little more careful."
During the interview both officers moved their respective chairs one to two feet toward the defendant.
At a later point in the interview Francis removed 3 photos from his pocket (3" x 5" or 3" x 6" in size) and angled them toward the defendant. Francis indicated verbally that these were the autopsy photos of Jarrel. The photos depicted the mortal neck lacerations to the 7 year old victim, Jarrel Cuyler. At this point in the interview Francis moved his chair right up near the defendant. Both Francis and the defendant were seated facing one another, Francis' legs were within inches of the defendant's and Francis' face was approximately 18 inches from the defendant's face. The defendant did not look at the photographs. She turned her head away and indicated that she could not look at them. She appeared to glance at the photos and looked away. While holding the photos Francis said words to the effect that "You have to do this child some justice."
After the photographs were displayed the defendant began to cry. Francis placed the photos in a stack on the desk which was to the defendant's right. The desk was approximately 3 feet to the defendant's right. The defendant was not facing the photos that were placed on the desk.
Several questions were asked of the defendant after the photographs CT Page 7903 were shown. The defendant was able to compose herself and answer further questions which concerned the defendant's subsequent contact with Alex Grajales. The defendant responded that about two hours after seeing Alex at Marty's Mobil she called him to make sure he was all right.
Francis then indicated to the defendant words to the effect that he did not believe the defendant was truthful and it was time to tell the truth. Francis then posed the question, "Who killed Jarrel?" The defendant leaned forward and responded, "I did." The defendant then put her head in her hands and said. "What have I done?" The defendant then started crying, had a hard time breathing; and was hysterically crying. She was unresponsive. The defendant was crying, then she would snap out of crying and stare at the walls. The defendant was asked if there was anything the officers could do for her and the defendant responded, "Just shoot me. I don't want to go to jail." The offices made no attempt to elicit additional information.
McGlynn left the interview room to get the defendant tissues and water. Francis remained in the room with the defendant. McGlynn did consult with his supervisors and it was determined that the defendant was, at this point, no longer free to leave.
McGlynn returned to the interview room with a Miranda rights/waiver form and proceeded to advise the defendant of her rights at 2:35 a.m. The defendant was crying at the time of the advisement. McGlynn read the defendant her rights one sentence at a time. The defendant indicated she understood her rights and initialed each line of her rights that were read to her. The defendant signed the rights portion of the form. The defendant did not sign the waiver portion. The defendant was shaking[9]
and sobbing when she signed the rights form. She then asserted that she wanted an attorney. The defendant then told McGlynn "I did not confess to anything", looked McGlynn in the eyes and said, "I'm sorry." The defendant asked Francis if he would be going to court with her.
Upon defendant's indicating she wanted an attorney, the officers did not renew questioning. The officers provided the telephone which was on the desk and a telephone book in order for the defendant to contact an attorney.
Both officers left the interview room in order to provide privacy for the defendant. The door to the interview room was closed. There was no indication that any officer guarded or was stationed at or about the door. The officers returned in approximately one-half hour.
Upon the officers return they inquired whether the defendant had contacted an attorney and the defendant indicated she had not and stated CT Page 7904 "I just want to go home."
Prior to the Miranda warning the defendant did not indicate at any time during the questioning that she did not want to answer any more questions nor did she indicate that she wanted to leave.
The interview was neither video nor audio recorded. The officers took no notes during the interview.
B. Statements Attributed to the Defendant While Enroute to the Courthouse.
Later that same morning, July 17, 1998, the defendant was transported from the Windsor Police Department to GA 13 in Enfield for court arraignment. She was transported by Det. Zemienski of the Windsor Police Department and McGlynn. Zemienski drove the vehicle. McGlynn and the defendant were in the rear seat of the vehicle. McGlynn advised the defendant that she was under the Miranda rights and anything she said could be used against her. The defendant acknowledged that she understood. The entire trip took approximately 10 to 15 minutes. There was no separation between the front and back seats. Zemienski heard conversation in the rear seat but could not discern its content. Zemienski heard no advisement of rights. It appeared to Zemienski that the defendant and McGlynn were speaking low enough that he did not hear the words. Zemienski, in addition to a police radio, had on an FM station.
McGlynn did not question the defendant during the transportation to court. It appeared to McGlynn that the defendant just wanted to talk. The defendant was "talking soft." The defendant asked McGlynn words to the effect of "how could she have gotten herself involved in this mess." The defendant inquired whether the officer had contacted her parents about her arrest and whether anyone else was going to be arrested.
 IV. DISCUSSION
A. Whether the Defendant was "In Custody" at the Stationhouse When Admissions Were Made.
It is well settled that a defendant is entitled to such (Miranda) warnings only if the statements are the product of custodial interrogation. State v. Medina, 228 Conn. 281, 288-289 (1994).
The defendant has the initial burden of showing that she was subjected to custodial interrogation before the State must prove that adequate warnings of the rights that inhere in the privilege against compelled self-incrimination were given to the defendant and that the defendant's CT Page 7905 waiver of her rights was constitutionally valid. Id.
Two conditions, therefore, give rise to the requirement of advice of rights under Miranda:
1. The suspect must be in custody of law enforcement officials; and
2. The suspect must be subjected to interrogation. (Citation omitted). To determine whether a suspect is in custody so as to require Miranda
warnings, we inquire whether a reasonable person, in view of all the circumstances, would have believed that he or she was not free to leave. Id., 289; United States v. Mendenhall, 446 U.S. 544, 554,100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).
The court will first determine whether the defendant was in custody prior to the advisement of the Miranda warnings.
A person is in custody only if, in view of all the surrounding circumstances, a reasonable person would have believed he or she was not free to leave. . . . Although the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest. . . ." (Citations omitted). State v. Ross, 230 Conn. 183, 204 (1994). A determination of whether the suspect was in custody must be based on an assessment of the facts surrounding her statements to the police.
The interview did take place at the stationhouse. It should be noted, however, that simply because questioning takes place in a police station does not mean that the environment is sufficiently coercive to trigger the Miranda warnings. Nor is it sufficient that the individual questioned is under suspicion. In short, law enforcement officers are not required to administer the warnings "to everyone whom they question." It is only when "there has been such a restriction on a person's freedom as to render him `in custody'" that the warnings are mandated. Oregon v.Mathiason, 429 U.S. 492, 495 (1997).
As indicated previously, the defendant has the initial burden of proving custodial interrogation. United States v. Charles, 738 F.2d 686,692 (5th Cir. 1984); State v. Doehrer, 200 Conn. 642, 647; State v.Medina, supra, 289 (1994). The police questioned the defendant at her residence on July 9, 1998 and at the police station on July 10th. Apparently, some type of rapport was established with the defendant and the police for when she was asked about 11:00 p.m. on July 16th to come to the stationhouse for additional questioning she appeared eager to CT Page 7906 cooperate with police.
Two discrete inquiries are essential to the determination [of custody]: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. State v. Walton, 41 Conn. App. 831, 835 (1996) citing Thompson v. Keohane, 516 U.S. 99, 112-13, 116 S.Ct. 457,133 L.Ed.2d 383, 1995). The first inquiry, "whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest." Id., is factual. . . . Id., 836. The second inquiry, whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave;"United States v. Mendenhall, supra, requires an "application of the controlling legal standard to the historical facts."
In the case at bar, the defendant came to the stationhouse voluntarily and expressed her willingness to cooperate with the police investigation. A person may be motivated to cooperate with police for a myriad of reasons: it may be in order to fulfill one's civic duty; or it may arise from a belief that anything less than the appearance of cooperation may invite greater police scrutiny. Whatever the reason, the defendant was willing to cooperate with the authorities. It is noteworthy that the defendant made no remonstration relevant to the lateness of the hour of the requested interview.
When the defendant arrived at the interview room at the stationhouse she was sufficiently relaxed and confident to greet Sgt. Francis by his first name.
At the outset of the interview the defendant was advised that she was not under arrest and was free to leave at any time.
The court infers that the defendant was not searched in any manner and was allowed to retain her purse. There is no indication of any restraints of any kind being placed upon her or of any kind of deprivation of food, drink, bathroom facilities or sleep. The interview lasted approximately 1 hour and 40 minutes. During this period the defendant made no request of the officers and did not ask to leave. Obviously, this was a stationhouse interview, the defendant was in a room with two police officers, at least one of whom moved in close proximity to the defendant during the questioning.
The court further finds that the defendant was in a chair with her back against the wall. There was a door near her which was not operable. The only means of egress available to her was straight ahead, past the CT Page 7907 officers, through the door she had entered. At least one officer moved in close proximity to the defendant during the latter part of the interview displaying graphic photographs of the victim and importuning the defendant to be truthful.
Based upon all the circumstances and any reasonable inferences to be drawn therefrom, the court finds that a reasonable person under the circumstances would have believed that he or she was free to leave.
It is the burden of the defendant to prove that she was in custody at a point in time when the incriminatory statement was made. The defendant has not carried her burden. The court finds that the defendant was not "in custody" and, accordingly, her Miranda rights had not yet attached.
Not having found the defendant "in custody" for Miranda purposes, the court need not inquire as to whether the defendant was subject to interrogation up to the time of the incriminatory statement.
The court further finds that the defendant was advised and understood her Miranda rights and further that the defendant did not waive any rights. She did in fact invoke her rights upon advisement and requested counsel.
After the defendant uttered the incriminatory statement, "I did" in response to the question "Who killed Jarrel?" the defendant was no longer free to leave and thereby in custody.
Immediately after the purported admission the defendant asked "What have I done?" This comment is in the nature of a rhetorical question, contributed voluntarily by the defendant and was not a response to any police interrogation.[10]
Upon observing the emotional condition of the defendant one of the officers inquired whether there was anything they could do for her (in the nature of seeking to do that which may contribute to her comfort under the circumstances) and the defendant responded, "Just shoot me. I don't want to go to jail." Again this is a statement, contributed suasponte and voluntarily by the defendant, and not the result of police interrogation. The officer was not intending to elicit an incriminatory statement from the defendant by the inquiry.
After advisement of Miranda rights additional statements are attributable to the defendant: "I did not confess to anything," "I'm sorry" and whether Francis would be going to court with her. These statements of the defendant, by their very nature, are voluntary and not the result of any police interrogation. CT Page 7908
B. Whether the Defendant was Subject to "Interrogation" Enroute to the Courthouse.
At the point in time of the defendant's advisement of her rights (approximately 2:35 a.m.) she was no longer free to leave and under arrest.
It is not disputed that later in the morning of July 17, 1998, when the defendant was in a police vehicle on her way to her court arraignment, the defendant was in custody.
The only remaining inquiry for this court is whether any statements attributed to the defendant while enroute to the courthouse are the results of any police interrogation.
This court has already stated the well established principle that, in addition to being in custody, a defendant is not entitled to Miranda
warnings unless he is also interrogated. State v. Medina, supra, 289. The defendant bears the initial burden of showing that he was subjected to interrogation. Id. "The term `interrogation' under Miranda is not limited to questioning explicitly designed to elicit an incriminating response but extends to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from a suspect. The police, however, cannot be held accountable for the unforeseeable results of their words or actions." (Citations omitted). Voluntary statements of any kind are not barred by the Fifth Amendment. Id., 290.
The testimony of McGlynn that he did not question the defendant while in transit is corroborated by the nature of the statements[11]
attributed to the defendant.
The first comment ("How could (I) have gotten (myself) involved in this mess?) is clearly rhetorical in nature and there is no evidence that it was in response to any police inquiry or act. The remaining comments attributed to the defendant are merely questions put forward voluntarily by the defendant and not subject to any protections.
C. Whether the Statements of the Defendant Were Voluntary
The defendant next claims that any incriminatory statements were not made voluntarily.
The court must next determine whether the defendant's statements were voluntary under the federal constitution. The State bears the burden of proving voluntariness of the defendant's confession by a preponderance of CT Page 7909 the evidence. Lego v. Twomey, 404 U.S. 477, 484, 92 S.Ct. 619,30 L.Ed.2d 618
(1972) as cited in State v. Lapointe, 237 Conn. 694, 728 (1996).
Under the due process clause of the Fourteenth Amendment, in order for a confession to be deemed "involuntary" and thus inadmissible at trial, "[t]here must be police conduct, or official coercion, causally related to the confession. . . ." Id., 728-29. "Absent police conduct causally related to the confession, there is simply no basis for concluding that any State actor has deprived a criminal defendant due process of law . . . [There is an] essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant on the other. Lapointe, Id., citing Colorado v.Connelly, 479 U.S. 157, 164-65, 107 S.Ct. 515,93 L.Ed.2d 473 (1986). Connelly requires that we consider the totality of the circumstances surrounding a defendant's confession to determine whether it was the product of the defendant's own volition, no matter how impaired, Id., 165; or "whether pressures exerted by officials have overborne the suspect's will, considering both the conduct of the officials and the capacity of the subject to reject pressure." Lapointe, supra, 730.
The Connecticut Supreme Court noted that "[e]ven where there is a causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a violation of the Due Process Clause. See Lapointe, supra. 732-33, footnote 44. The inquiry is not merely whether the defendant would have confessed "but for" the police conduct, but, rather, whether the particular defendant's capacity to resist the police pressure was overborne. If the police conduct is insufficient to overcome the defendant's capacity to resist but the defendant still elects to confess, due process is not offended. Id.
"[T]he use of an involuntary statement of a defendant in a criminal trial violates a defendant's right to due process of law. . . . As a prerequisite to admissibility the State is required to prove, by a preponderance of the evidence, that under all the circumstances admissions by an accused were voluntarily made. Lego v. Twomey, 404 U.S. 477, 489,92 S.Ct. 619, 30 L.Ed.2d 618 (1972). . . ." (Citations omitted). Statev. Medina, 228 Conn. 281, 293 (1994). Under the federal due process clause, however, the defendant must establish that his lack of voluntariness was the result of improper police activity. "The measure of voluntariness [under the federal constitution] is whether a review of all the circumstances surrounding the elicitation of the statement reveals that the conduct of the law enforcement officials involved was such as to overbear the will of the accused to resist and bring about a statement not freely determined. Id. A statement by the defendant that is the CT Page 7910 product of police coercion, therefore. may not be used by the State against that individual. Id., citing Colorado v. Connelly, 479 U.S. 157,163-164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).
During the investigation of this homicide the defendant committed herself to a certain version of events relevant to her whereabouts at or about the time preceding the alleged homicide. Subsequently, but prior to the defendant's interview of July 17th as part of their investigation, the police received additional information which they believed to be inconsistent with the version of events previously elicited from the defendant. The information the officers did receive linked the defendant to foreign items recovered at the crime scene.
In the July 17th interview the officers utilized an interview technique whereby police questioned the initial version of the defendant as to her whereabouts and during the interview provided information to the defendant piece meal which could lead the defendant to reasonably infer that the police had more knowledge about the matter than they were prepared to reveal to the defendant. This technique caused the defendant to repeatedly augment her initial version of her whereabouts and activities during relevant times of the investigation.[12] The line of questioning caused the defendant to become increasingly anxious.
The defendant's composure progressively deteriorated during the questioning in relation to the facts provided by the police.
At the outset of the interview the defendant was advised that she was not under arrest and was free to leave at any time. The defendant was 23 years of age, educated, and was employed as a practical nurse by the Department of Corrections. The defendant had never before been arrested.
The defendant was not searched, not handcuffed and not in any way restrained. The defendant was allowed to retain her purse. There is no indication of any request by defendant that questioning be stopped or that she desired to leave. There is no evidence of any threats or other improper comments directed to the defendant. There was no evidence of deprivation of food, drink or sleep. There is no evidence of actual or threatened physical brutality. The defendant was not subjected to an extended period of incommunicado interrogation.
In Colorado v. Connelly, supra, the United States Supreme Court held that a confession, even one prompted by a mental or emotional condition that prevents it from being the product of a rational intellect and a free will, cannot be held involuntary under the principles of due process, unless it is linked to official coercion by government agents. The court reasoned that because the sole concern of the Fifth Amendment's CT Page 7911 privilege against compulsory self-incrimination, upon which the Miranda decision was based, is governmental coercion, the Miranda warnings protect criminal suspects against governmental coercion leading them to surrender rights secured by the Fifth Amendment; it goes no further than that. Official coercion is required, therefore, before a confession can qualify for "involuntary" status pursuant to due process analysis, irrespective of how dubious the suspect's mental condition may be.Connelly, supra, 165-67, 169-70.
Thus, the Connelly decision restricts the application of the term "involuntary" to confessions obtained by governmental coercion, and, consequently, the absence of coercive police activity is fatal to a claim of involuntariness under due process analysis. Id.
The defendant herein asserts that under a totality of circumstances analysis, including the display of autopsy photos, the proximity of the officer to the defendant and an exhortation to "do this child some justice" is police coercion or police overreaching that renders the defendant statements involuntary.
Although there is evidence that the defendant may have glanced at the photos, the evidence is substantial that the defendant did not look at the photographs nor was the defendant compelled in any manner to look at the autopsy photographs. The defendant looked away and began to cry. Shortly after the display of the photographs, the defendant regained her composure and other questions were posed to the defendant that she answered. That was followed by the inquiry of "Who killed Jarrel?"
A distraught emotional state, arising out of the circumstances leading to the arrest . . . does not prevent a finding of voluntariness. . . .State v. Harris, 188 Conn. 574, 582 (1982).
The emotional condition of the defendant is more likely attributed to the realization that police have information relevant to her potential involvement in criminal activity and not attributed to any police misconduct or coercion.
The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived her Miranda rights. State v. Stanley, 223 Conn. 674, 676 (1992). This court finds that the state has not met its burden of proof.
After being advised of her Miranda rights the defendant refused to sign the waiver portion of the rights/waiver form. Concomitant, or shortly after the defendant's refusal to sign the waiver form, the defendant indicated that she wanted an attorney. This clear assertion of her rights CT Page 7912 at this juncture corroborates to some degree the finding of this court that the defendant's will had not been subverted to that of her interrogators. The officers scrupulously respected the defendant's request for an attorney and did not renew questioning of any kind.
While some members of the community may find the conduct attributed to the officers in this case is disturbing, the courts have accorded law enforcement a certain degree of latitude in the investigation of criminal activity. This court finds that the police overreaching contemplated by the Supreme Court in Connelly is substantially more egregious than the conduct ascribed to the officers herein.[13]
The court does not find it persuasive to expand the defendant's due process rights under Article I § 8 of the Connecticut Constitution beyond that minimum standard guaranteed by our Federal Charter.
The court cannot find, under the circumstances of this case, that the officers engaged in misconduct or in otherwise improper coercive tactics.
The court finds, under the totality of circumstances, that the conduct of the police officers did not overbear the defendant's will to resist and bring about a confession not freely determined. The state has carried its burden of proof on the issue of voluntariness.
Accordingly, the Motion to Suppress Purported Statements of Defendant on July 17, 1998, is denied.
Miano, J.